**Loris PIZZINI, et al., Plaintiffs,**

v.

**AMERICAN INTERNATIONAL SPE-CIALTY LINES INSURANCE CO., Defendant.**

**No. 99–CV–3297.**

United States District Court,
E.D. Pennsylvania.

June 28, 2002.

---

Roger E. Legg, Legg & Wilson, Parkesburg, PA, for plaintiffs.

Lawrence J. Bistany, Dave E. Edwards, Anthony L. Miscioscia, White and Williams, for defendant.

William E. Mahoney, Jr., Stradley, Ronon, Stevens and Young, Malvern, PA, for movant.

### *MEMORANDUM AND ORDER*

ANITA B. BRODY, District Judge.

This action involves an insurance coverage dispute between an insurer and assignees of an insured arising out of the sale of speculative oil well leases. Plaintiffs Loris Pizzini, Donna Pizzini, Leone Pizzini, Tullia Pizzini, Valerio Pizzini, Mirachiara Bache, and Thomas Bache ("the Pizzini–Bache plaintiffs") and plaintiffs Dodie Pettit and Kevin Gray ("the Pettit–Gray plaintiffs") are two groups of people who purchased oil well leases from Stephen Barry Shellington ("Shellington"), an authorized agent for the Equitable Life Assurance Society of the United States ("the Equitable"). Shellington was insured under professional liability policies issued by defendant American International Speciality Insurance Company ("AISLIC") to the Equitable and its agents. The oil ventures failed, and both groups of

plaintiffs filed suit against Shellington in Pennsylvania state court. AISLIC agreed to defend Shellington against plaintiffs' claims subject to a reservation of rights. Without the consent of AISLIC, Shellington entered into a settlement agreement with plaintiffs in state court in which he stipulated to the entry of judgment in favor of each plaintiff for a specified amount ("consent judgment") and assigned to plaintiffs his rights under two AISLIC policies: AISLIC policy number 230–76–05, effective January 1, 1995 through January 1, 1996 ("the 1995 policy"), and (2) AISLIC policy number 243–27–99, a renewal of the 1995 policy, effective January 1, 1996 to January 1, 1997 ("the 1996 policy"). AISLIC refused to pay plaintiffs.

Plaintiffs subsequently filed suit in federal court against AISLIC, asserting four causes of action: two counts of breach of contract for failure to indemnify and two counts of bad faith.

AISLIC now moves for partial summary judgment on the breach of contract counts.

## I.  FACTUAL BACKGROUND[1]

In 1995, Stephen Barry Shellington, a registered agent of the Equitable and its securities entity, Equico, Inc. ("Equico"), solicited the sale of certificates of interest in various oil wells located in Kentucky. The oil wells interest were being offered by an entity called Goff & Melton, Inc. After being contacted by Shellington, plaintiffs Loris Pizzini, Donna Pizzini, Leone Pizzini, Tullia Pizzini, Valerio Pizzini, Mirachiara Bache, Thomas Bache, Dodie Pettit and Kevin Gray purchased oil well interests from Shellington between March and June 1995.

The oil ventures failed. Sometime prior to the end of August 1995, the Pizzini–Bache plaintiffs contacted Shellington seeking repayment of their investments. On August 30, 1995, counsel for the Pizzini–Bache plaintiffs sent a letter to Shellington demanding repayment:

[The Pizzini–Bache plaintiffs] invested differing amounts totaling $349,000.00 in Kentucky oil and gas leases this spring, purchases which you induced them to make in violation of the Pennsylvania Securities Act of 1972, 70 P.S. § 1–101 et seq. . . . . On behalf of our clients, we herewith demand from you repayment of the above listed considerations paid for such oil and gas leases and tender to you all of the aforesaid leases our clients obtained in exchange therefor  . . . Since you have already failed to acknowledge or accept their verbal offers and tenders, we cannot extend the deadline for acceptance of this offer and tender beyond ten (10) days from the date of delivery hereof. Failure to accept this offer will, of course, cause us to undertake and pursue *all* available legal remedies against you at the earliest date possible.

(Joint Stipulation of Facts, Ex. E, 1–2).

Presumably in response to the demand letter, Shellington retained the law firm of Stradley Ronon Stevens and Young ("Stradley"). On October 2, 1995, Stradley attorney Stephen Baker sent a letter to counsel for the Pizzini–Bache plaintiffs on behalf of Shellington asking that counsel contact him regarding the August 30, 1995 demand letter.

On October 30, 1995, the Pizzini–Bache plaintiffs filed suit against Shellington in the Court of Common Pleas of Chester County, Pennsylvania, claiming that Shell-

---

1.  Many of the facts presented here are taken from the parties' joint stipulation of facts. The facts not contained in the joint stipulation have been considered in the light most favorable to plaintiffs.

ington (1) had made numerous misrepresentations about the oil well interests and (2) sold unregistered securities in violation of Pennsylvania law ("the Pizzini–Bache lawsuit").[2]

On January 3, 1996, Shellington was served with a copy of the Pizzini–Bache complaint. On January 17, 1996, Shellington notified AISLIC by letter that he was being sued by the Pizzini–Bache plaintiffs and enclosed a copy of the complaint. In this letter, he also requested that Stradley be appointed as defense counsel.

By letter dated February 29, 1996, AISLIC agreed to provide a defense for Shellington against the Pizzini–Bache action under the 1995 policy of insurance issued by AISLIC to the Equitable, subject to a reservation of rights. AISLIC expressly reserved the right to deny coverage, among other reasons, if he was involved in selling the oil well interests:

> [I]f you were in any way involved with selling the [oil well interests], there would be no coverage unless the oil lease wells were products sold through [the Equitable or Equico Securities, Inc.] In the event that it is found that you in any way were involved in selling or soliciting this product, there would be no coverage for this matter.

(AISLIC Statement of Facts, Tab 14, 3). The letter further stated:

> [AISLIC] reserves all rights and defenses it may have under the policy and at law, including the right to examine and raise other issues which might affect coverage.

(See id. at 4). The letter also informed Shellington that it had appointed Keith Dutill of Stradley as defense counsel in the matter.

In March 1996, plaintiffs Pettit and Gray, represented by the same counsel as the Pizzini–Bache plaintiffs, also filed suit against Shellington in the Chester County Court of Common Pleas ("the Pettit–Gray lawsuit") raising the same claims as in the Pizzini–Bache lawsuit. Shellington notified AISLIC of the Pettit–Gray lawsuit.

By letter dated April 8, 1996, AISLIC agreed to defend Shellington against the Pettit–Gray lawsuit under the 1995 policy, subject to a reservation of rights, and appointed Stradley as defense counsel. Like the February 29, 1996 reservation of rights letter, this letter also informed Shellington that:

> [I]f you were in any way involved with selling the [oil well interests], there would be no coverage unless the oil lease wells were products sold through [the Equitable or Equico Securities, Inc.] In the event that it is found that you in any way were involved in selling or soliciting this product, there would be no coverage for this matter.

(AISLIC Statement of Facts, Tab 15, 3). The April 8, 1996 letter contained the identical reservation of rights statement as in the February 29, 1996 letter:

> [AISLIC] reserves all rights and defenses it may have under the policy and at law, including the right to examine and raise other issues which might affect coverage.

(See id. at 4).

Soon thereafter, the Court of Common Pleas of Chester County consolidated the Pizzini–Bache and Pettit–Gray lawsuits (referred to as "the state action").

At or about this time, Federal law enforcement officials initiated an investigation of Shellington's involvement in the sale of the oil well interests. Shellington

---

**2.** In December 1995, the Equitable placed Shellington on investigatory suspense. Shellington resigned from the Equitable in January 1996.

retained personal counsel in connection to this investigation.

During discovery in the state action, plaintiffs sought to obtain a copy of all insurance policies under which an insurance company may be liable to satisfy part or all of any judgment which may be entered against Shellington in the action. On June 27, 1996, in response to an order to compel, counsel for Shellington, William Mahoney of Stradley, sent plaintiffs a copy of the 1996 AISLIC policy.

On July 12, 1996, plaintiffs' counsel sent a letter to Mahoney in which he stated his belief that Mahoney had sent plaintiffs the wrong AISLIC policy:

> Thank you for your letter of June 27, 1996 (which was not received by my office until July 11, 1996) and its enclosure, a copy of the Errors and Omissions policy issued by American International Specialty Lines Insurance Company to [the Equitable] and Agents of the Equitable ... I was very disappointed to find, however, that the enclosed policy is for a period subsequent to the filing of the Pizzini's complaint: namely, commencing January 1, 1996. As you know, the Pizzinis' complaint was filed in 1995. As you also know, the enclosed policy is a claims made policy. Therefore, this policy does not cover the Pizzini's claim; it did not go into effect until after the claim had been made and it is not retroactive.

(AISLIC Statement of Facts, Tab 9).

According to an affidavit prepared by plaintiffs' counsel, Mahoney telephoned plaintiffs' counsel upon receipt of the letter. Mahoney informed counsel that "his conclusion that the [1996] policy was not applicable to the claims of the plaintiffs against Shellington in the State Action was wrong and that just the opposite was true." (Pl. Statement of Facts, Tab 22, ¶¶ 6, 7).

Based on Mahoney's representation, plaintiffs' counsel advised his clients that:

> [T]here appeared to be enough insurance on Shellington, which covered plaintiffs' claims, notwithstanding the reservation of rights that [Shellington's] counsel advised had been issued by AISLIC, that if they could prevail on their claims, they appeared collectible from [the 1996] policy.

(*See id.* at ¶ 8).

On February 13, 1997, plaintiffs in the state action noticed Shellington's deposition. Shellington attended the deposition but declined to answer any questions "at the advice of counsel." Plaintiffs' counsel filed a motion to compel Shellington to answer in state court. Stradley, on behalf of Shellington, opposed the motion. On May 2, 1997, the Court of Common Pleas of Chester County issued an order granting the motion to compel and providing that Shellington would be precluded from testifying at trial regarding any matter about which he refused to answer questions in pretrial depositions.

Plaintiffs notice another deposition of Shellington. Shellington again attended the deposition but continued to assert his constitutional privilege and declined to answer any questions at the deposition.

On October 14, 1998, AISLIC sent Shellington a supplemental reservation of rights letter in which it identified the 1996 policy as the policy governing plaintiffs' claims. In this letter, AISLIC informed Shellington:

> We have been advised that you have refused to testify in defense of these claims, invoking your Fifth Amendment right. It is our understanding that the court, while not compelling you to submit to deposition, has ordered that if you do not submit to deposition, you will be unable to testify at time of trial ... As

your refusal to testify will make it impossible for you [sic] to testify at the time of trial, you are in violation of condition 7 of your policy and AISLIC will not be obligated to indemnify you for any resulting judgment.

(AISLIC Statement of Facts, Tab 17, 6). AISLIC expressly reserved its rights to deny coverage on grounds not specifically identified in the letter: "[T]his reservation of rights should not be construed as a waiver of any other terms or conditions of the policy not mentioned in this letter." (*See id.* at 8). The letter concluded:

AISLIC [sic] has on several occasions advised you that, for the reasons stated above, any judgments entered against you as a result of this claim would not be covered under your AISLIC [sic] policy. Under these circumstances, AISLIC [sic] would again inquire as to whether you are prepared to contribute any amount in excess of your deductible to settle this matter.

(*See id*).

On March 9, 1999, Shellington executed a settlement agreement with plaintiffs in the state action pursuant to which he consented to the entry of judgment against him in favor of each plaintiff. In total, Shellington stipulated to $387,500 in judgments. As part of the agreement, Shellington assigned his rights under the 1996 AISLIC policy to plaintiffs. The judgments entered in the state action against Shellington were not the result of a trial or other determination of factual or legal issues.

AISLIC did not consent to the judgments or the assignment of rights in the March 9, 1999 settlement agreement and refused to pay.

On June 28, 1999, plaintiffs, as assignees of Shellington, filed the instant action against AISLIC, asserting claims of breach of contract and bad faith for AISLIC's failure to indemnify Shellington under the 1996 policy.

On November 1, 2000, Shellington assigned his rights under the 1995 AISLIC policy to plaintiffs. AISLIC did not consent to this assignment of rights.

On January 22, 2001, plaintiffs filed an amended complaint in federal court. The only amendment to the original complaint was the addition of averments that AISLIC's failure to indemnify Shellington in the state court action constituted a breach of either the 1995 or the 1996 policy.

The terms of the 1995 and 1996 AISLIC policies are substantively the same. The only difference between the two policies is the period of coverage. The 1995 policy was effective January 1, 1995 through January 1, 1996. The 1996 policy is a renewal of the 1995 policy and was effective January 1, 1996 through January 1, 1997. Both policies provide coverage on a "claims made and reported" basis. Paragraph 1 of the Insuring Agreements of the 1995 and 1996 policies states:

American International Specialty Lines Insurance Company herein called the "Insurer" agrees as follows: ... Errors and Omissions: To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages resulting from any Claim or Claims first made against the Insured and reported in writing to the Insurer during the Policy Period for any Wrongful Act[3] of the Insured ... but only if such Wrongful Act occurs during or prior to the Policy Period ... and solely in ren-

---

**3.** "Wrongful act" is defined in the policies as "any actual or alleged negligent act, error, or omission or personal injury." (AISLIC Statement of Facts, Tabs 1 & 2, Definitions, ¶ 2).

dering or failing to render Professional Services for others for a fee ..."

(AISLIC Statement of Facts, Tabs 1 & 2, Insuring Agreements, ¶ 1).

Condition 1 of the policies further specifies:

**Policy Period and Territory**

This policy applies to Wrongful Acts occurring anywhere in the world ... but only if Claim is first made against the Insured and reported in writing to the Insurer during the Policy Period ... A Claim is first made against the insured during the Policy Period ... if during the Policy Period ... the Insured shall have knowledge or become aware of any Wrongful Act which could reasonably be expected to give rise to a Claim under this policy and shall during the Policy Period ... give written notice thereof ... If any Claim is first made against the Insured during the Policy Period ... alleging Damages which are payable under this policy, any additional Claims which are made, or suits or proceedings in connection therewith ... for Damages resulting from the same Wrongful Act shall be considered part of the claim which was first made during the Policy Period ...

(*See id.* at Tabs 1 & 2, Conditions, ¶ 1).

According to Condition 9 of the policies:

Two or more Claims arising out of a single act, error, or omission or a series of related acts, errors, or omissions shall be treated as a single Claim. All such Claims, whenever made, shall be considered first made during the Policy Period ... in which the earliest Claim arising out of such acts, errors, or omissions was first made, and all such Claims shall be subject to a single limit of liability.

(*See id.* at Tabs 1 & 2, Conditions, ¶ 9).

The policies define "claim" as:

[A] demand received by the Insured for compensation for Damages, including the services of suit or institution of arbitration proceedings against the insured, but does not include a request or demand for non-pecuniary injunctive relief.

(*See id.* at Tabs 1 & 2, Definitions, ¶ 11).

"Damages" is defined as:

[A]ll sums which an Insured is legally obligated to pay for any Claim to which this insurance applies and shall include judgments and settlements, provided always that Damages shall not include fines or penalties imposed by law or because of other matters which may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

(*See id.* at Tabs 1 & 2, Definitions, ¶ 12).

The policies also contain "duty to cooperate" and "no action" clauses. Condition 7, the "duty to cooperate" clause, provides:

The Insured must cooperate with the Insurer and, upon the Insurer's request, assist in making settlements, in the conduct of suits ... and the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense.

(*See id.* at Tabs 1 & 2, Conditions, ¶ 7).

Condition 8 provides:

No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by writ-

ten agreement of the Insured, the claimant, and the Insurer.

(*See id.* at Tabs 1 & 2, Conditions, ¶ 8).

In addition, the policies include a list of twenty-two "exclusions," circumstances under which the policies do not apply. (*See id.* at Tabs 1 & 2, Exclusions A–V).

At all relevant times, Shellington possessed a brochure entitled "the Professional Liability Insurance Program for Equitable Agents."[4] The cover letter attached to the brochure is dated November 10, 1994 and is signed by a Senior Vice President of the Equitable. According to the cover letter, the brochure "contains all the information that Agents need to know about Equitable's Errors and Omissions (E & O) program." (Pl. Statement of Facts, Tab 24, 2). In a section entitled, "What to do in the event of a claim or potential claim," the brochure provides:

1. When an insured Agent is aware of circumstances which may lead to a claim being made, or as soon as an actual claim is made, it is to be reported to A.I. Management . . .

. . .

3. If a Summons and Complaint has been issued, send it along with your cover letter to A.I. Management providing as much detail as possible . . .

(*See id.* at 5).

AISLIC now moves for summary judgment on plaintiffs' breach of contract counts on several grounds: (1) Shellington's liability did not arise out of the sale of a security covered under the AISLIC policies; (2) plaintiffs' claims were not first made and reported during a single policy period as required by the express terms of the AISLIC policies; (3) Shellington breached his duty to cooperate with AISLIC when he invoked his Fifth Amendment privilege against self-incrimination and, therefore, was not entitled to indemnification under · the policies; (4) Shellington's voluntary, unilateral decision to enter into the settlement agreement with plaintiffs breached the voluntary payment and no action clauses of the AISLIC policies; and (5) plaintiffs' claims are barred by various exclusions in the AISLIC policies.

I find that AISLIC is entitled to summary judgment on the ground that plaintiffs' claims against Shellington were not covered under either the 1995 or the 1996 policy because they were not "first made and reported" during a single policy period. Accordingly, I need not consider AISLIC's alternative grounds for summary judgment.

## II. LEGAL STANDARD

### A. Summary Judgment

A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The trial court should determine whether there are issues with regard to material facts that warrant a trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, the court must consider the underlying facts in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that might be drawn from those same facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Sempier v. Johnson and Higgins,* 45 F.3d 724,

---

**4.** There is no indication in the record of who prepared the brochure. AISLIC denies having done so and speculates that it was the Equitable.

727 (3d Cir.1995) (en banc). It is appropriate to grant summary judgment if the court finds that the record "could not lead a rational trier of fact to find for the nonmoving party, [and] there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548.

### B. Choice of Law

AISLIC contends that New York law governs this dispute. Plaintiffs assert that Pennsylvania law applies. Before a choice of law question arises, however, an actual conflict must exist between the potentially applicable bodies of law. *On Air Entertainment Corp. v. National Indem. Co.*, 210 F.3d 146, 149 (3d Cir.2000). AISLIC concedes that Pennsylvania and New York law are consistent with respect to whether it is entitled to summary judgment on the ground that plaintiffs' claims were not first made and reported during a single policy period. Thus, no conflict exists. Accordingly, as AISLIC has done, I will look to Pennsylvania law in analyzing AISLIC's arguments for summary judgment.

### C. Interpretation of Insurance Contracts

Under Pennsylvania law, the insured has the burden to prove that a particular claim falls within the coverage of a policy. *Jacobs Constructors, Inc. v. NPS Energy Services, Inc.*, 264 F.3d 365, 376 (3d Cir. 2001) (citing *Erie Ins. Exch. v. Transamerica Ins. Co.*, 516 Pa. 574, 583, 533 A.2d 1363, 1368 (1987)). Thus, as assignees of Shellington's rights under the AISLIC policies, plaintiffs must prove coverage. *See Pentlong Corp. v. GLS Capital, Inc.*, 780 A.2d 734, 748 (Pa. Comwlth.Ct.2001) (rights of an assignee rise no higher than those of its assignor).

■ Where the terms of a contract are clear and unambiguous, they must be given their "plain and ordinary meaning." *St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 (3d Cir.1991) (*quoting Pennsylvania Mfrs. Ass'n Ins. Co. v. Aetna Casualty & Sur. Ins. Co.*, 426 Pa. 453, 457, 233 A.2d 548, 551 (1967)); *Carosella*, 189 F.Supp.2d at 252. Determining whether or not a term of a contract is ambiguous is a question of law. *See Lewis*, 935 F.2d at 1431. A term is ambiguous "if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning ... a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction." *Bohler–Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93 (3d Cir.2001) (quoting *Samuel Rappaport Family Partnership v. Meridian Bank*, 441 Pa.Super. 194, 657 A.2d 17, 21–22 (1995)). To the extent that ambiguities exist, they are to be construed in favor of the insured, and against the insurer. *Employers Reinsurance Corp. v. Sarris*, 746 F.Supp. 560, 563 (E.D.Pa.1990).

### III. DISCUSSION

To prevail on their breach of contract claims against AISLIC, plaintiffs must es-

tablish that AISLIC had a duty to indemnify Shellington for the consent judgment entered in state court pursuant to the settlement agreement between Shellington and plaintiffs. In other words, plaintiffs must establish that their claims against Shellington were covered under either the 1995 or 1996 policy. Pursuant to paragraph 1 of the Insuring Agreements of both policies, AISLIC was obligated under each policy to pay on behalf of Shellington only those claims "first made against the Insured and reported in writing to the Insurer during the Policy Period ..." (AISLIC Statement of Facts, Tabs 1 & 2, Insuring Agreements, ¶ 1). Condition 1 of the policies further provides:

> A Claim is first made against the insured during the Policy Period ... if during the Policy Period ... the Insured shall have knowledge or become aware of any Wrongful Act which could reasonably be expected to give rise to a Claim under this policy and shall during the Policy Period ... give written notice thereof ...

(*See id.* at Tabs 1 & 2, Conditions, ¶ 1).

The language of the AISLIC policies is clear and unambiguous: only claims that are reported in writing to AISLIC in the same policy period in which they were "first made" are covered. This type of policy is referred to as a "claims made" insurance policy. A "claims made" policy protects against claims made during the life of a policy irrespective of when the act giving rise to the claim occurred. It differs from the other major type of insurance policy, an "occurrence" policy, which protects an insured against occurrences during a policy period, regardless of when the resulting claims are made. *See Township of Center, Butler County, Pa. v. First Mercury Syndicate, Inc.*, 117 F.3d 115, 118 (3d Cir.1997). Failure to comply with the reporting provision of a "claims made" pol-

icy precludes coverage. Although a harsh consequence, "claims made" policies, and their reporting provisions, are enforceable. *See Zuckerman v. National Union Fire Ins. Co.*, 100 N.J. 304, 495 A.2d 395, 400–403 (N.J.1985) (reviewing cases in which the validity of "claims made" policies was challenged and rejected). As courts have recognized, a "claims made" insurance policy represents a distinct bargained—for exchange between insurer and insured. An insurer obtains the benefit of a clear and certain cut-off date for coverage. In return, the insured typically pays a lower premium. *See Employers Reinsurance Corp. v. Sarris*, 746 F.Supp. 560, 564 (E.D.Pa.1990).

Pennsylvania courts have not directly addressed the enforceability or validity of the restrictions to coverage under a "claims made" policy. The only case that I found containing more than a passing reference to "claims made" policies was *Consulting Engineers, Inc. v. Ins. Co. of North America*, 710 A.2d 82 (Pa.Super.Ct.1998), in which the court noted, albeit in dicta, that had the insurance policy at issue in that case been a "claims made" policy, which it was not, the insured would not be entitled to indemnification because he did not report the claim during the policy period. *See id.* at 85, n. 5. The Pennsylvania Supreme Court has held, however, in the context of an occurrence policy for automobile insurance, that to deny coverage based on an insured's failure to comply with the notice provision, an insurer must prove not only that the notice provision was breached but also that it suffered prejudice as a consequence. *See Brakeman v. Potomac Insurance Co.* 472 Pa. 66, 371 A.2d 193, 197–99 (Pa.1977). Plaintiffs do not cite nor did I find a case in which a Pennsylvania court extended the *Brakeman* "notice-prejudice" rule to a "claims made" policy. In *Consulting Engineers Inc.*, the Superior Court made no mention of a "prejudice"

requirement. *See Consulting Engineers Inc.*, 710 A.2d at 85, n. 5.

Several courts in this circuit have considered whether to extend the *Brakeman* rule to "claims made" policies, and none was able to locate Pennsylvania authority directly on point. *See e.g. Borish v. Britamco Underwriters, Inc.*, 869 F.Supp. 316, 319 (E.D.Pa.1994). In light of the lack of Pennsylvania authority, these courts expressly declined to extend the *Brakeman* rule to "claims made" policies, in recognition of the critical differences between these two types of policies. *See Borish*, 869 F.Supp. at 319; *Sarris*, 746 F.Supp. at 564–65; *City of Harrisburg v. International Surplus Lines Ins. Co.*, 596 F.Supp. 954, 960–61 (D.C.Pa.1984), *aff'd w/o opinion*, 770 F.2d 1067 (3d Cir.1985). As the court in *City of Harrisburg* explained:

> [T]he purpose of the notice provision in an occurrence policy [is] to give the insurer time to investigate the claim for defense or settlement ... In a claims made policy, the provision requiring notice before the end of the policy period serves a different purpose. It provides a certain date after which an insurer knows that it no longer is liable under the policy, and accordingly, allows the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty.

*Id.* at 962.

Other state courts and federal courts interpreting state law have also recognized the distinction in the purpose of notice provisions in occurrence policies as opposed to "claims made" policies and have declined to adopt a "notice-prejudice" rule for "claims made" policies. *See e.g. Esmailzadeh v. Johnson and Speakman*, 869 F.2d 422, 424–25 (8th Cir.1989) (lower court did not err in refusing to apply a "notice-prejudice" rule to a "claims made"

policy under Minnesota law); *Zuckerman v. National Union Fire Ins. Co.*, 100 N.J. 304, 495 A.2d 395, 400–03 (N.J.1985) (where insurance policy is a "claims made" policy, an insurer need not show that it was prejudiced by an insured's failure to timely report a claim in order to deny coverage of the claim). *See also American Home Assurance Co. v. International Ins. Co.*, 90 N.Y.2d 433, 684 N.E.2d 14, 661 N.Y.S.2d 584, 586–88 (N.Y.1997) (declining to require primary insurers providing "occurrence" coverage to demonstrate prejudice based on insured's failure to satisfy notice provision).

I have found only two cases in which courts have extended a "notice-prejudice" rule to "claims made" policies. *See Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087 (7th Cir.1999) (applying Wisconsin law); *Sherlock v. Perry*, 605 F.Supp. 1001 (E.D.Mi.1985) (applying Michigan law). In both cases, however, the state whose laws governed the interpretation of the policies had statutes in effect expressly requiring all liability insurance policies to include a provision that failure to give notice as required by the policy does not bar liability unless the insured was prejudiced by the failure. *See Lexington Ins. Co.*, 165 F.3d at 1091 (rejecting argument that notice-prejudice rule does not apply to "claims made" policies where Wisconsin statute expressly incorporates a notice-prejudice rule in all liability policies); *Sherlock*, 605 F.Supp. at 1004 (pursuant to an express provision of the Michigan Insurance Code, insurer must show it was prejudiced by insured's failure to timely report claim under all liability policies including "claims made" policies). Pennsylvania does not have such a statute.

■ In the absence of controlling Pennsylvania authority, the weight of existing case law leads me to conclude, as have the courts in this circuit, that under Pennsyl-

vania law the *Brakeman* "notice-prejudice" rule does not apply to "claims made policies." Thus, an insurer providing liability coverage under a "claims made" policy need not show it was prejudiced by an insured's failure to provide timely notice of a claim in order to deny coverage on that ground. Accordingly, in order to be entitled to coverage under either the 1995 or 1996 policy, plaintiffs must demonstrate that Shellington reported their claims to AISLIC during the same policy period in which they were "first made" as those terms are defined in the policy.

### A. The 1995 policy

Plaintiffs' claims against Shellington are covered under the 1995 policy if they were (1) "first made" during the 1995 policy period[5], and (2) reported in writing by Shellington to AISLIC within the 1995 policy period. According to Condition 1 of the policies, plaintiffs' claims were "first made" against Shellington when he had "knowledge or [became] aware of any Wrongful Act which could reasonably be expected to give rise to a Claim." (AISLIC Statement of Facts, Tabs 1 & 2, Conditions, ¶ 1). Because the Pizzini–Bache plaintiffs and the Pettit–Gray plaintiffs proceeded separately against Shellington in state court, at least initially, I will consider the two groups of plaintiffs separately in determining when their claims were "first made."

■ The Pizzini–Bache plaintiffs first contacted Shellington in the summer of 1995 seeking repayment of their investments in the Kentucky oil well ventures. Shellington apparently did not respond to this initial overture. On August 30, 1995, the Pizzini–Bache plaintiffs, through counsel, sent a demand letter to Shellington in which they claimed that Shellington had induced them to purchase the Kentucky oil leases in violation of the Pennsylvania Securities Act of 1972, and demanded repayment for each plaintiff, in the total amount of $349,000. Their letter also informed Shellington that failure to accept their offer within ten days "will, of course, cause us to undertake and pursue *all* available legal remedies against you at the earliest possible date." (Joint Stipulation, Ex. E). On October 2, 1995, Shellington's personal counsel, Stephen Baker of Stradley, responded to the demand letter of the Pizzini–Bache plaintiffs requesting that their counsel contact him to discuss the matter.

On October 30, 1995, the Pizzini–Bache plaintiffs filed suit against Shellington in the Court of Common Pleas of Chester County. The complaint was served on Shellington on January 3, 1996. By letter dated January 17, 1996, Shellington informed AISLIC for the first time of the claim of the Pizzini–Bache plaintiffs and enclosed a copy of the Pizzini–Bache complaint. In March 1996, plaintiffs Pettit and Gray also filed suit against Shellington in the Court of Common Pleas of Chester County raising the same allegations contained in the Pizzini–Bache complaint.

At the very latest, Shellington first had "knowledge" or became "aware of a Wrongful act which could reasonably be expected to give rise to" the Pizzini–Bache claim when he received the August 30, 1995 demand letter from this group of plaintiffs. Indeed, the demand letter itself was sufficient to constitute a "claim" as defined under the policies. According to the policies, a claim is "a demand received by the Insured for compensation for Damages, including the services of suit or institution of arbitration proceedings against the insured." (AISLIC Statement of Facts, Tabs 1 & 2, Definitions, ¶ 11). "Damages" is defined as "all sums which

---

5. The 1995 policy was effective January 1, 1995 through January 1, 1996.

an insured is legally obligated to pay." (*See id.* at Definitions, ¶ 12). In their August 30, 1995 letter to Shellington, the Pizzini–Bache plaintiffs asserted in no uncertain terms that Shellington had violated Pennsylvania law in selling them the oil well interests, a "wrongful act," and, as a result, they were entitled to repayment of their investments in specified amounts. The letter also expressly notified Shellington of their intent to pursue "legal remedies" against him if he did not accept their offer of repayment. *See Carosella & Ferry, P.C. v. TIG Insurance Co.,* 189 F.Supp.2d 249, 253–54 (E.D.Pa.2001) (letter notifying insured of claimants' intent to file suit against insured constituted a "claim" under insurance policy where policy defined "claim" as "a demand received by the Insured for money or services"). *Compare American Guarantee & Liability Ins. Co. v. Fojanini,* 90 F.Supp.2d 615, 625 (E.D.Pa.2000) (letter that "did not directly assert a legal right or obligation" or "an imperative request" did not constitute a "demand" as defined in Black's Law Dictionary).

Whether the August 30, 1995 demand letter merely notified Shellington of the claim of the Pizzini–Bache plaintiffs or was itself a "claim," this claim was "first made" against Shellington on the date he received their August 1995 demand letter. While this specific date is unknown, Shellington received the letter at the very latest by October 2, 1995, the date that his counsel responded to the letter. Thus, the claim of the Pizzini–Bache plaintiffs was "first made" during the 1995 policy period.

■ Notwithstanding the fact that they did not file suit against Shellington in state court until March 1996, the claim of plaintiffs Pettit and Gray was also "first made" against Shellington during the 1995 policy period. Condition 9 of the AISLIC policies provides:

Two or more Claims arising out of a single act, error, or omission or a series of related acts, errors, or omissions shall be treated as a single Claim. All such Claims, whenever made, shall be considered first made during the Policy Period ... in which the earliest Claim arising out of such acts, errors, or omissions was first made ...

(AISLIC Statements of Facts, Tabs 1 & 2, Conditions, ¶ 9). According to their state court complaint, the claim of plaintiffs Pettit and Gray arose from Shellington's solicitation and their purchase of the same oil well leases that Shellington solicited and sold to the Pizzini–Bache plaintiffs during the same time period (March and June 1995). Under the plain meaning of Condition 9, Shellington's solicitation and sale of the same oil well leases at the same time was either "a single act, error, or omission" or "a series of related acts, errors, or omissions." Plaintiffs do not contend otherwise, nor do they present any evidence to the contrary. Accordingly, the Pettit–Gray claim is "considered first made during the Policy Period ... in which the earliest Claim arising out of such acts, errors, or omissions was first made." As I concluded above, the "earliest" claim, the Pizzini–Bache claim, was "first made" during the 1995 policy period. Therefore, the Pettit–Gray claim was also "first made" during the 1995 policy period.

Plaintiffs do argue, although not vociferously, that their claims against Shellington were not "first made" for purposes of the reporting requirement until Shellington was served a copy of the Pizzini–Bache complaint on January 3, 1996. Plaintiffs' argument is belied by the clear terms of the policies. Nowhere do the policies indicate that a claim is "first made" only upon receipt of a complaint. They provide just the opposite. Again, "claim" is defined as a "demand received by the Insured for

compensation for Damages, *including* the services of suit or institution of arbitration proceedings against the Insured ..." (Definitions, ¶ 11). Thus, the policies do not limit the term "claim" to the services of a suit. Furthermore, the policies expressly state that a claim is "first made" not only when a claim is "actually made" against the insured, which itself could occur before the service of a complaint, as was the case here, but also when an insured becomes aware of a wrongful act that could reasonably be expected to lead to a claim. Either way, plaintiffs' claims were "first made" when Shellington received the August 30, 1995 demand letter.

Thus, because plaintiffs' claims were "first made" during the 1995 policy period, Shellington had to report them to AISLIC by the end of the 1995 policy period (January 1, 1996) in order to be entitled to coverage under this policy. Shellington, however, did not report the Pizzini–Bache claim until January 17, 1996, more than three months after he first became aware of it. He did not report the Pettit–Gray claim until March 1996. Shellington, therefore, did not comply with an express condition of coverage under the policy. Thus, AISLIC was not obligated to cover plaintiffs' claim against Shellington under the 1995 policy.

### B. The 1996 policy

Like the 1995 policy, Shellington was only entitled to coverage under the 1996 policy for claims that were "first made" during the 1996 policy period and reported to AISLIC during the 1996 policy period.[6] As I concluded earlier, the claims of both the Pizzini–Bache plaintiffs and the Pettit–Gray plaintiffs were "first made" in the 1995 policy period. Thus, they do not even fall within the scope of coverage of the 1996 policy regardless of when Shellington

reported them to AISLIC. Shellington, therefore, was not entitled to coverage of plaintiffs' claims under the 1996 policy.

### C. Plaintiffs' Defenses

Plaintiffs object to AISLIC's denial of coverage under the "claims made and reported" condition of the AISLIC policies on the following grounds: (1) a brochure supplied to agents of the Equitable obfuscates the reporting requirement under the AISLIC policies; and (2) AISLIC should be estopped from raising this defense against coverage.

#### (1) The Brochure

■ Plaintiffs submit a copy of a brochure entitled "the Professional Liability Insurance Program for Equitable Agents" that, according to the cover letter attached to it, "contains all the information that Agents need to know" about Equitable's insurance program. (Pl. Statement of Facts, Ex. 24, 3). Dated November 10, 1994, the cover letter is addressed to "All Agency Managers" and is from a Senior Vice President of the Equitable.

Plaintiffs have failed to establish that I may look to this brochure in interpreting the AISLIC policies. AISLIC disputes that it is the author of this brochure, a contention to which plaintiffs have not responded. The cover letter accompanying the brochure suggests that the Equitable, not AISLIC, produced the brochure. Furthermore, according to the date of the cover letter, the brochure was issued in November 1994, prior to the effective date of either the 1995 or 1996 AISLIC policy. It is a basic principle of contract law that "the meaning of a clear and unequivocal written contract must be determined by its contents alone." *Bohler–Uddeholm,* 247 F.3d at 92 (quoting *Steuart v. McChesney,*

---

**6.** The 1996 policy was effective January 1, 1996 through January 1, 1997.

498 Pa. 45, 444 A.2d 659, 661 (Pa.1982)). " 'Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence.' " *Id.* The "claims first made and reported" provisions of the AISLIC policies are clear and unambiguous. All of the relevant terms are defined. Accordingly, I may not look outside the contract in giving effect to the provision. Therefore, this brochure, whose author is unknown and which was issued prior to the date of the policies in this case, is irrelevant.[7]

(2) Estoppel and Waiver

Plaintiffs also assert that AISLIC is estopped from denying coverage based on Shellington's failure to comply with the "claims first made and reported" requirement of the policies. According to plaintiffs, AISLIC should not be allowed to deny coverage on this ground because it misled both Shellington and plaintiffs as to whether it was providing a defense against plaintiffs' claims under the 1995 or 1996 policy. Although they frame it as an estoppel arguments, plaintiffs also argue that AISLIC waived this defense to coverage. Plaintiffs' arguments necessitate a brief review of the procedural history.

Shellington first notified AISLIC of the Pizzini–Bache claim (and lawsuit) by letter dated January 17, 1996. On February 29, 1996, AISLIC sent a reservation of rights letter to Shellington which informed him that it was providing a defense against the claim under the 1995 policy, and that it had appointed Stradley as defense counsel at Shellington's request. The letter also identified specific exclusions which AISLIC explained may apply to preclude coverage of the Pizzini–Bache claim, and further reserved "all rights and defenses it may have under the policy and at law, including the right to examine and raise other issues which might affect coverage." (AISLIC Statement of Facts, Tab 14, 1–4). Represented by the same counsel as the Pizzini and Bache plaintiffs, plaintiffs Pettit and Gray filed suit against Shellington in March 1996, and Shellington notified AISLIC of the Pettit–Gray claim upon being served with a copy of the complaint. On April 3, 1996, AISLIC sent an almost identical reservation of rights letter to Shellington regarding the Pettit–Gray claim/lawsuit, also identifying the 1995 policy as the policy under which it was providing a defense to the claim and notifying Shellington that various exclusions contained in the policy could preclude coverage of this claim. (AISLIC Statement of Facts, Tab 15). Soon thereafter, the Court of Common Pleas of Chester County consolidated the Pizzini–Bache and Pettit–Gray actions.

---

7. Even if it were proper to consider the brochure in interpreting the policies, the statements in the brochure that plaintiffs cite do not conflict with the express terms of the policies. In a section of the brochure entitled, "What to do in the event of a claim or potential claim," the brochure instructs, "When an insured Agent is aware of circumstances which may lead to a claim being made, or as soon as an actual claim is made, it is to be reported to A.I. Management" at the address provided. (Pl. Statement of Facts, Ex. 24, 3). According to plaintiffs, it is not clear from this instruction whether an agent must notify AISLIC when he first learns of circumstances leading to a claim or whether he can wait until a claim is actually made, the approach taken by Shellington. Plaintiffs appear to read the brochure's phrase "as soon as an actual claim is made" to mean "as soon as an actual complaint or case is filed." Yet nowhere in the brochure is a "claim" defined as a "complaint" or a "suit." Indeed, the brochure subsequently states, "If a Summons and Complaint has been issued, send it along with your cover letter to A.I. Management." Thus, this subsequent instruction indicates that a claim could be "made" without a summons or complaint being issued, thereby undermining plaintiffs' unstated assumption to the contrary.

During discovery in the state court action, plaintiffs' counsel sought to obtain a copy of the applicable AISLIC policy that potentially covered their claims against Shellington. On June 27, 1996, in response to a court order to provide plaintiffs "all the terms of any insurance agreement pursuant to which any insurance company may be liable to satisfy part or all of any judgment which may be entered in this action against [Shellington]," Shellington's counsel, William Mahoney of Stradley, sent to plaintiffs' counsel a copy of the **1996** AISLIC policy. (Pl. Statement of Facts, Exs. 20 & 21). On July 12, 1996, plaintiffs' counsel sent a letter to Mahoney informing him that he had sent a copy of the wrong policy. In the letter, plaintiffs' counsel explained that the policy Mahoney had sent him, the 1996 policy, "is for a period subsequent to the filing of the Pizzini's complaint . . . As you know, the Pizzinis' complaint was filed in 1995." (AISLIC Statement of Facts, Tab 9). According to an affidavit prepared by plaintiffs' counsel, Mahoney telephoned plaintiffs' counsel upon receipt of the letter and informed him that the 1996 policy was, indeed, the correct policy governing plaintiffs' claims. (Pl. Statement of Facts, Tab 22). Based on Mahoney's representation, plaintiffs' counsel advised his clients that it appeared that they would be able to collect under Shellington's insurance policy. (*See id.*).

Almost two years later, AISLIC sent a supplemental reservation of rights letter to Shellington dated October 14, 1998 in which it indicated that it was providing a defense against the Pizzini–Bache and Pettit–Gray claims under the **1996** policy. This reservation of rights letter again listed several provisions of the 1996 policy under which AISLIC reserved its right to deny coverage and further stated that "this reservation of rights should not be construed as a waiver or any other terms or conditions of the policy not mentioned in this letter." (AISLIC Statement of Facts, Tab 17, 8).

Thus, according to the record, AISLIC initially identified the 1995 policy as the policy governing plaintiffs' claims and subsequently represented that the claims were governed by the 1996 policy. As a result of AISLIC's equivocation, plaintiffs argue, AISLIC should be estopped from denying coverage under either policy on the ground that Shellington did not report plaintiffs' claims in the same policy period in which they were first made. Plaintiffs also suggest that AISLIC either waived or should be estopped from asserting this defense to indemnification because AISLIC did not specifically reserve its right to deny coverage on this ground in any of the reservation of rights letters which it issued to Shellington.

■ I will consider plaintiffs' waiver argument first. Under Pennsylvania law, the doctrine of waiver or estoppel cannot create an insurance contract where none existed. *See Wasilko v. Home Mut. Cas. Co.,* 210 Pa.Super. 322, 232 A.2d 60, 63 (Pa.Super.Ct.1967) (citing *Donovan v. New York Cas. Co.,* 373 Pa. 145, 94 A.2d 570 (Pa.1953)). With respect to waiver, the Pennsylvania Supreme Court has stated:

No party is required to name all his reasons at once . . . and the assignment of one reason for refusal to pay cannot be a waiver of any other existing reason, unless the other is one which could have been remedied or obviated, and the adversary was so far misled or lulled into security by silence as to such reason that to enforce it now would be unfair or unjust.

*Slater v. General Cas. Co. of America,* 344 Pa. 410, 25 A.2d 697, 699 (1942) (quoted in *Pfeiffer v. Grocers Mutual Ins. Co.,* 251 Pa.Super. 1, 379 A.2d 118 (Pa.Super.Ct.1977)).

In *Wasilko v. Home Mut. Cas. Co.*, 210 Pa.Super. 322, 232 A.2d 60 (Pa.Super.Ct.1967), the Superior Court further explained, "[t]he rule is well-established that conditions going to the coverage or scope of a policy of insurance, as distinguished from those furnishing a ground of forfeiture, may not be waived by implication from the conduct or action of the insurer." *Id.* at 63.

Applying these principles here, AISLIC did not waive its right to deny coverage of plaintiffs' claims under either the 1995 policy or the 1996 policy based on Shellington's failure to report the claims in the same policy period in which they were first made. In its reservation of rights letters to Shellington, AISLIC did not specifically identify this ground as one under which it reserved its rights to deny coverage. Each letter, however, did contain a "catch-all" statement that AISLIC reserved its right to raise other issues or defenses that might affect coverage. More importantly, as "claims made and reported" insurance policies, the requirement that Shellington report plaintiffs' claim to AISLIC in the same policy period in which he became aware of them goes to the scope of coverage of the policies. It is not merely a condition of forfeiture. Thus, under *Wasilko*, this defense cannot be waived. *See Wasilko*, 232 A.2d at 63. Furthermore, Shellington's failure to report the claims in the policy period in which they were "first made" is not a "reason for refusal to pay" that "could have been remedied or obviated" had AISLIC informed Shellington from the outset that it was reserving its right to deny coverage on this ground under either policy. *Slater*, 25 A.2d at 699. The damage was done when Shellington waited three months too long to report the Pizzi-

ni–Bache claim and five months too long to report the Pettit–Gray claim.

Plaintiffs' estoppel argument also fails. To make out a claim for estoppel, "there must be such conduct on the part of the insurer as would, if the insurer were not estopped, operate as a fraud on some party who has taken or neglected to take some action to his own prejudice in reliance thereon." *Id.* In the context of an insurer's failure to assert all possible defenses to coverage, plaintiffs must demonstrate "actual prejudice, that is, when the failure to assert all possible defenses causes the insured to act to his detriment in reliance thereon." *Mendel v. Home Ins. Co.*, 806 F.Supp. 1206, 1215 (E.D.Pa. 1992). A party's reliance on an insured's conduct must be reasonable. *See Continental v. Alperin*, 1998 WL 212767, *8–9 (E.D.Pa. Apr. 29, 1998). Plaintiffs bear the burden to establish each element of estoppel by "clear, precise and unequivocal evidence." *Chrysler Credit Corp. v. First Nat. Bank and Trust Co.*, 746 F.2d 200, 206 (3d Cir.1984).

In analyzing whether AISLIC should be estopped from raising the defense of Shellington's failure to report plaintiffs' claims in the same policy period in which they were first made, and thus deny coverage under both policies, AISLIC's conduct towards Shellington must be distinguished from its conduct toward plaintiffs. The only claims before me now are plaintiffs' breach of contract claims against AISLIC for its failure to indemnify Shellington under either the 1995 or 1996 policy. Plaintiffs stand here solely as assignees of Shellington, and not on their own claims against AISLIC.[8] Whether Shellington's counsel misled plaintiffs in the state court proceedings regarding which AISLIC policy governed plaintiffs'

---

8. Plaintiffs have not asserted a direct cause of action against AISLIC in this action.

claims is not the relevant inquiry.[9] The relevant inquiry is whether AISLIC misled Shellington about which policy governed the claims made against him to such an extent that if AISLIC were not estopped, it would (1) operate as a fraud on Shellington who (2) took or neglected to take some action to his own prejudice in reliance on AISLIC's inconsistent statements, and (3) that Shellington's detrimental reliance was reasonable. *Wasilko*, 232 A.2d at 63; *Alperin*, 1998 WL 212767 at *8.

I need not decide whether AISLIC's inconsistent statements to Shellington regarding which policy governed plaintiffs' claims amounted to a fraud on Shellington because plaintiffs cannot show as a matter of law that Shellington was prejudiced by AISLIC's inconsistent statements, nor that he reasonably relied on them. Shellington had notice from AISLIC's first correspondence with him that it would not indemnify him if, among other reasons, he was found to have been "involved in selling or soliciting" the oil well interests to plaintiffs. AISLIC informed Shellington of its position in both the February 29, 1996 and April 8, 1996 reservation of rights letters. In its supplemental reservation of rights letter dated October 14, 1998, AISLIC informed Shellington that his failure to submit to deposition in the state court action rendered him in violation of his duty to cooperate under the policy and, therefore, "AISLIC will not be obligated to indemnify you for any resulting judgment." (AISLIC Statement of Facts, Tab 17). In the October 14, 1998 letter, AISLIC further advised Shellington that "any judgment entered against you as a result of this claim would not be covered under your

AISLIC policy." (*See id*). Five months later, in March 1999, Shellington entered into a settlement agreement with plaintiffs in the state court action without AISLIC's consent.

Based on AISLIC's unequivocal statements to Shellington reserving its right not to indemnify Shellington on multiple grounds, no reasonable juror could conclude that Shellington was prejudiced by AISLIC's failure to clearly identify which policy governed plaintiffs' claims, or its failure to assert in its reservation of rights letters the defense that plaintiffs' claims were not reported during the same policy period in which they were first made. As the record makes clear, at the time that Shellington settled with plaintiffs in state court, he had notice of AISLIC's unqualified position that it would not indemnify him for plaintiffs' claims. This is not a case where the insured was operating under the assumption from the outset that claims made against him were covered under one insurance policy or another.

Moreover, plaintiffs cannot demonstrate that Shellington reasonably relied to his own detriment on AISLIC's initial representation that it was providing a defense under the 1995 policy, or its subsequent representation that the 1996 policy governed plaintiffs' claims. As I concluded earlier, plaintiffs' claims were "first made" in the 1995 policy period, but not reported until the 1996 policy period. According to the clear and unambiguous terms of each policy, Shellington was not entitled to coverage under either the 1995 or the 1996 policy. Thus, assuming for the sake of argument that Shellington relied on AISL-

---

9. Furthermore, it is far from clear that the actions of Shellington's counsel, William Mahoney of Stradley, are attributable to AISLIC. AISLIC appointed Stradley to defend Shellington at Shellington's request. However, the record indicates that AISLIC did not control Stradley's defense of Shellington in the state action. That Shellington was in control of his own defense is further evidenced by his execution of the settlement agreement with plaintiffs without AISLIC's consent.

IC's initial statement that the 1995 policy governed plaintiffs' claims, he could not have reasonably concluded that he was entitled to coverage under this policy since he failed to report plaintiffs' claims during that policy period as he was required to do. Nor would Shellington's detrimental reliance on AISLIC's subsequent indication that the 1996 policy applied have been reasonable because plaintiffs' claims were not "first made" during that policy period and thus did not fall within the scope of coverage of that policy. *See Continental v. Alperin*, 1998 WL 212767 at *8–9 (insured cannot establish reasonable reliance where express terms of the insurance policy exclude coverage of claims against insured).

For all of the above reasons, I conclude that plaintiffs' estoppel and waiver claims fail. Because Shellington did not report plaintiffs' claims to AISLIC in the same policy period in which they were "first made," as condition to coverage under both policies, he was not entitled to coverage for the claims under either policy. AISLIC, therefore, did not breach the terms of either policy when it refused to pay plaintiffs according to the settlement agreement executed between Shellington and plaintiffs in the state court action. Accordingly, AISLIC is entitled to summary judgment on plaintiffs' breach of contract claims.

### ORDER

**AND NOW**, this 28th day of June 2002, it is **ORDERED** that AISLIC's motion for partial summary judgment (Docket # 30) is **GRANTED**. Count 1 and Count 2 of plaintiffs' amended complaint are dismissed.