**CITY OF HARRISBURG and Stephen R. Reed, as Mayor and Individually, Plaintiffs,**

**v.**

**INTERNATIONAL SURPLUS LINES INSURANCE COMPANY and Woolf/Strite Associates, Inc., Defendants.**

### Civ. A. No. 84–1113.

United States District Court, M.D. Pennsylvania.

Oct. 31, 1984.

Karen Balaban, Balaban & Balaban, Harrisburg, Pa., for plaintiffs.

Robert P. Reed, Harrisburg, Pa., for Woolf/Strite Associates.

Arthur J. Murphy, Jr., Arthur J. Murphy, Jr. & Associates Robert A. Weinheimer, Pittsburgh, Pa., for International Surplus Lines Ins. Co.

## MEMORANDUM

CALDWELL, District Judge.

Defendants, International Surplus Lines Insurance Co. (International Surplus), and Woolf/Strite Associates, Inc. (Woolf/Strite), have moved to dismiss plaintiffs' complaint pursuant to Fed.R. Civ.P. 12(b)(6).[1] In this dispute concerning coverage under a "claims-made" insurance policy, defendants contend that they have no obligation to pay for the costs and attorney's fees incurred by plaintiff, Stephen R. Reed, Mayor of the City of Harrisburg, in defending a libel and wrongful use of civil proceedings action brought against him.[2] The case hinges upon a legal interpretation of the policy so that a motion to dismiss is an appropriate vehicle to test the legal sufficiency of the complaint.

■ Initially, however, we will dispose of a jurisdictional difficulty not addressed by any of the parties—a lack of complete diversity of citizenship between them. "Parties to litigation can neither agree to nor create federal jurisdiction." *Lang v. Windsor Mount Joy Mutual Insurance Co.*, 507 F.Supp. 967, 968 (E.D.Pa.1981). "When the foundation of federal authority is, in a particular instance, open to question, it is incumbent upon the courts to resolve such doubts, one way or the other, before proceeding to a disposition of the merits." *Carlsberg Resources Corp. v. Cambria Savings and Loan Ass'n*, 554 F.2d 1254, 1256 (3d Cir.1977). The complaint alleges that Harrisburg is located in the Commonwealth of Pennsylvania. (¶ 1). It is therefore a citizen of Pennsylvania for diversity purposes. *See Reeves v. City of Jackson*, 532 F.2d 491, 495 n. 5 (5th Cir. 1976). It further alleges that Mayor Reed is "also of the City of Harrisburg, Dauphin County, Commonwealth of Pennsylvania."

(¶ 1). Defendant, International Surplus, is alleged to be a citizen of Illinois (¶ 2), but defendant, Woolf/Strite is alleged to be incorporated in Pennsylvania with its principal place of business in Harrisburg. (¶ 3). Complete diversity is therefore lacking here because one of the defendants is a citizen of the same state as the plaintiffs. *See American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951).

■ Ordinarily, the complaint should therefore be dismissed, *see Schultz v. Cally*, 528 F.2d 470 (3d Cir.1975), but a party may be dropped to achieve diversity if its presence is not essential to a just adjudication. *Gallo v. Yamaha Motor Corp.*, 488 F.Supp. 502 (E.D.Pa.1980). Dropping a party depends upon whether it is indispensable to the action. *Field v. Volkswagenwerk AG*, 626 F.2d 293 (3d Cir.1980). In *Field*, the court held that the plaintiff driver of a van involved in a single car collision could properly be dropped as a dispensable party to preserve diversity jurisdiction over the claims of the representatives of her passengers against the defendant manufacturer of the van. The defendant corporation was a citizen of West Germany and after suit was brought discovery revealed the driver to be a citizen of Czechoslovakia, not of New York as she had claimed. Thus, parties on both sides of the lawsuit were citizens of foreign states and complete diversity was lacking. Relying upon Fed.R.Civ.P. 19 in determining that the driver was dispensable, the court stated:

If the right of either [passenger] to relief against [the defendant] were established, these parties would be awarded a judgment; if their claims are not sustained, their complaint would be dis-

---

1. International Surplus and Woolf/Strite were originally represented by the same counsel who filed a motion on behalf of both of them. Subsequently, Woolf/Strite retained separate counsel who filed another motion to dismiss on behalf of Woolf/Strite separately. Because of our disposition of the jurisdictional issue below, however, we will not consider the merits of Woolf/Strite's individual motion.

2. The City of Harrisburg is also a plaintiff apparently because of its pleaded duty under 42 Pa.C.S. § 8547 to reimburse the mayor for legal expenses incurred in defending a claim arising from conduct within the scope of his office. The policy provides that the insurer will reimburse it for indemnification it must provide Mayor Reed by law.

missed. In either event, the district court will be able to grant complete relief as between the parties without the joinder of [the driver], and, as we have shown above, it is unnecessary to join [the driver] as a party in order to enable [defendant] to defend against these claims. [Defendant], while it may be entitled to contribution or indemnity from [the driver], cannot be subject to multiple obligations since its liability, if any, will be several. Nor, as Professor Moore has emphasized, does the possibility of a subsequent adjudication that may result in a judgment that is inconsistent as a matter of logic, trigger the application of Rule 19.

*Id.* at 301–02 (brackets added) (footnote omitted).

█ In the instant case, Woolf/Strite has been sued merely because it was International Surplus's agent in selling the policy to the City. No independent basis of liability is asserted against it. Plaintiffs are looking to the insurance policy, and, ultimately, International Surplus for payment of damages. Accordingly, Woolf/Strite is not an indispensable party to this action. Just as in *Field*, plaintiffs may obtain complete relief without Woolf/Strite's presence. By the same token, if plaintiffs cannot show that coverage is available under the policy, International Surplus has not been prejudiced by Woolf/Strite's dismissal. In short, complete relief as between the remaining parties would be available, and we will dismiss Woolf/Strite from this action to maintain our diversity jurisdiction.

We turn now to the merits of plaintiffs' claim. The underlying cause of action arose from the mayor's remarks and actions shortly after he won the general election for mayor of Harrisburg on November 3, 1981. His conduct is set forth in the state court complaint attached as Exhibit "B" to plaintiffs' complaint in this action. On November 5, 1981, two days after becoming mayor-elect, Mayor-elect Reed publicly accused certain unnamed employees of the City Department of Public Works of

"'official and criminal misconduct.'" (Exhibit "B", ¶ 13). He centered his accusations on the city's steam generating plant, supervised by the Deputy Director of Harrisburg's Department of Public Works, the plaintiff in the state court action. Mayor-elect Reed accused the employees of misappropriation of public property for private gain and other official misconduct, including abuse of bidding laws at the plant, fraudulently maintained payrolls and the hiring of ghost employees. (Exhibit "B", ¶¶ 14, 15). The charges were widely disseminated in the local media. (Exhibit "B", ¶ 17).

The following day Mayor-elect Reed filed a Petition for Injunction in the Dauphin County Court of Common Pleas. In it he named the Deputy Director of Public Works, among others, and sought to enjoin what the mayor-elect believed was the removal of public records from the steam generating plant for the purposes of destroying them. (Exhibit "B", ¶¶ 18, 19). In connection with the filing of the Petition, Mayor-elect Reed held a press conference, listed other areas of official misconduct, and, naming the Deputy Director, asserted that the latter was the motivating factor behind his seeking the injunction. (Exhibit "B", ¶¶ 30, 33). The complaint against Mayor Reed in state court further alleged that Mayor Reed occupied the position of Mayor-elect when he made these accusations. (Exhibit "B", ¶ 58). Mayor Reed was sworn in as mayor on January 4, 1982. (Exhibit "B", ¶ 12).

The state court complaint against Mayor Reed was filed on November 4, 1982, and defendants received notice of it on April 24, 1984, and June 13, 1984. The policy term ran from March 25, 1981 to January 15, 1983. The defendants denied liability and refused to defend Mayor Reed because, in part, they received notice of the claim after the expiration of the policy term, (Complaint, ¶¶ 23, 26), in violation of the policy's provisions. (Complaint, ¶ 8). The state court case came to trial and on June 22, 1984, a jury returned a verdict on the libel count in favor of the Deputy Director but

found against him on the wrongful use of civil proceedings claim. Mayor Reed allegedly incurred $36,618.44 in attorney's fees and costs in defending the lawsuit, (Complaint, ¶¶ 7, 28, and Exhibit "D"), and seeks those expenses as damages here.[3]

■ Bearing in mind the Pennsylvania rule that interpretation policy of insurance requires the court to ascertain the intent of the parties by examining the written instrument, and when the writing is clear and unambiguous, a court is required to give effect to the language,[4] *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 469 A.2d 563 (1983), we conclude that the mayor was not an insured under the policy at the time of his actions giving rise to the underlying claim.

■ The claims-made, "Public Officials and Employees Liability Insurance" policy, attached to the complaint as Exhibit "A", provides, in relevant part, as follows:

I. Coverages A and B

A. The Company will pay on behalf of the Insureds all Loss the Insureds shall be legally obligated to pay for any civil claim or claims first made against them because of a Wrongful Act, provided that the claim is first made during the policy period and written notice of said claim is received by the Company during the policy period.

. . . .

III Definitions

. . . .

B. "Insureds" shall mean ... all persons who were, now are or shall be lawfully elected or lawfully appointed officials....

C. "Wrongful Act" shall mean any actual or alleged error or misstatement or misleading statement or act of omission or neglect or breach of duty including misfeasance, malfeasance and nonfeasance by an Insured, as public official or employee of the public entity.

D. "Loss" shall mean any amount which the Insureds are legally obligated to pay ... for any claim or claims made against them for Wrongful Acts and shall include ... cost of investigation and defense of legal actions....

In accordance with paragraph D of the Definitions, plaintiffs must first establish coverage before Mayor Reed can obtain reimbursement for his attorney's fees and costs in defending the state court action. They attempt to do so by asserting Mayor Reed was a "lawfully elected" official of Harrisburg at the time of his conduct as well as at the time the claim was made against him by the filing of the state court lawsuit. Hence, he was an insured within the meaning of the policy. They cite the Third Class City Code, 53 P.S. § 35701 (1957), and *Goodwin v. County of Allegheny*, 182 Pa.Super. 28, 125 A.2d 640 (1956), to buttress their contention that Mayor Reed was lawfully elected as mayor at the critical dates in November even though he may not have assumed the duties of the office until the following January when he was sworn in. In this regard plaintiffs also refer to the Deputy Director's state-court complaint, which accused Mayor Reed of having acted under his apparent authority as Mayor-elect.

We are not persuaded by plaintiffs' argument. Mayor Reed was not elected as mayor in November of 1981. He was elected to be mayor commencing on January 4, 1982. Until that time he was not the mayor. 53 P.S. § 35701 does not support the plaintiffs. That section merely provides, in substance, that the office of mayor shall be an elected one and that the term of office shall commence in January following the

---

3. The verdict was for an amount that was less than the deductible amount under the policy, so that our concern is limited to the matter of costs and attorneys' fees.

4. In addition to the jurisdictional issue, the parties also do not specifically address the choice of law issue in this case although they seem to assume that Pennsylvania law applies. Applying Pennsylvania's conflict of law rules, we also conclude that Pennsylvania law controls the disposition of this case. *See Melville v. American Home Assurance Co.*, 584 F.2d 1306 (3d Cir. 1978).

election. It does not provide that the successful candidate shall be considered to be mayor immediately upon being elected.[5] *Goodwin, supra,* is also inapposite. The Pennsylvania Superior Court in *Goodwin* was construing Article III, § 13 of the then Pennsylvania Constitution.[6] The section dealt in part, with increases in a public officer's salary during his term of office and specifically provided that "[n]o law shall ... increase or diminish a [public officer's] salary ... after his election or appointment." (brackets added). The Superior Court, in the context of a claim by a county register of wills, stated that an "officer is elected on the day the ballots are cast notwithstanding that he does not ... assume the duties of the office until a later date," [182 Pa.Super. at 32, 125 A.2d at 643] but held only that, in accordance with the language referring to "after his election," a public official could not accept a wage increase enacted after election but prior to taking office. There was no holding that the officer becomes a public official upon election. In short, Mayor Reed may have been lawfully elected in November but he was not necessarily a lawfully elected "official" at that time.

The policy language also refers to persons who "shall be" lawfully elected officials but the policy only covers a lawfully elected official for "Wrongful Acts" which are defined in the contract as actions performed "as public official or employee of the public entity." Thus, to permit Mayor Reed to recover from International Surplus we must conclude that a Mayor-elect is a public official or employee of a public entity. Plaintiffs touched .upon this issue themselves when they noted in their brief that the state-court complaint accused Mayor Reed of having acted under his apparent authority as Mayor-elect while committing the libel.

We do not believe that Mayor Reed's status as Mayor-elect made him a public official or employee of Harrisburg. There is no office of Mayor-elect. Section 35701 refers only to the office of mayor. A Mayor-elect has no duties or responsibilities. Mayor Reed was not on the city's payroll between his election and his inauguration nor was he compensated by the city during this time in any other way. In short, Mayor Reed's designation as Mayor-elect was merely descriptive of his status as the next mayor of Harrisburg. It connoted no official status or any connection with the city. Accordingly, we conclude that Mayor Reed was not a public official or employee of Harrisburg at the time of his allegedly wrongful conduct and there was no coverage for him under the policy.

■ In any event, even if Mayor Reed was a lawfully elected official, and acting as a public official of Harrisburg, at the time of the conduct complained of in the state court complaint, we nevertheless conclude that International Surplus had no duty to defend him because Mayor Reed failed to give it notice of the claim within the policy period as required by the contract.

First, we reject plaintiffs' contention that the newspaper articles of November 5, 1982, gave the insurer, through its Pennsylvania agent, Woolf/Strite, constructive notice of the claim within the policy period. We think the notice contemplated by the contract is notice from an insured to the insurer that a claim allegedly covered under the policy has been made. A newspaper article written and published by strangers to the insurance contract, intended to be read by the general public, does not meet that requirement. Without some action by an insured, and especially in light of the policy language discussed above, the insurer would have no way of knowing that

5. 53 P.S. § 35701 provides, in relevant part, as follows:

The elected officers of each city shall be a mayor, four councilmen, a controller, and a treasurer.... [E]ach of such officers shall serve for a term of four years from the first Monday of January next succeeding his election, until the first Monday of January in the fourth year thereafter. Any such officer shall be eligible to reelection.

6. Now Article III, § 27 of the 1968 Constitution.

a claim for coverage was being made under its policy.

■ Second, we reject plaintiffs' contention that, in the absence of notice within the policy period, *Brakeman v. Potomac Insurance Co.*, 472 Pa. 66, 371 A.2d 193 (1977), places the duty upon the insurer in this case to show prejudice from the late notice before coverage can be denied. In *Brakeman*, the court was construing an "occurrence" policy.[7] The policy contained the following language:

> *In the event of an accident, occurrence or loss, written notice* containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, *shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.*
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> No action shall lie against the company unless, *as a condition precedent thereto, the insured shall have fully complied with all of the terms of this policy,* nor until the amount of the insured's obligation to pay shall have been finally determined either *by judgment against the insured after actual trial* or by written agreement of the insured, the claimant and the company.

*Id.* at 69–70, 371 A.2d at 194–95 (emphasis in original).

The accident giving rise to the underlying claim occurred on March 3, 1970, when Brakeman's motorcycle collided with the insured's automobile. There was no question that the accident happened during the policy term. Defendant Potomac denied coverage, however, because it did not receive written notice of the accident until October 6, 1970. After obtaining a judgment against the insured for the amount of the policy limits, plaintiff sued the insurer to establish coverage but the trial court

denied relief on the grounds that the notice was unreasonably late and in violation of the contract term requiring it "as soon as practicable." The Supreme Court granted a new trial. Overruling its prior case law which looked only to the length of delay in giving notice and the reasons offered for the delay, it held that when "an insurance company seeks to be relieved of its obligations under a liability insurance policy on the ground of late notice, the insurance company will be required to prove that the notice provision was in fact breached and that the breach resulted in prejudice to its position." *Id.* at 76–77, 371 A.2d at 198.

Plaintiff's unstated assumption in relying upon *Brakeman* is that there is no material difference between an "occurrence" policy and a "claims-made" policy in connection with the notice requirements of each. At first blush, this appears to be a reasonable assumption. Both policies are intended to insure during a specific period of time against liability arising from the conduct of the insured. One type of policy, the occurrence policy, keys upon when that conduct occurs. If it occurs during the policy period, the insurer has a duty to indemnify and defend the insured regardless of when the claim against the insured is made. Conversely, the other type of policy, the claims-made policy, keys upon when the claim is asserted against the insured. If it is made against the insured during the policy period, the insurer has to perform under the contract regardless of when the conduct giving rise to the claim occurred. Thus, it would seem that notice provisions in both types of policies should serve the same role and merely protect the insurer by giving it adequate time to investigate and prepare the insured's defense. When the insurer cannot show prejudice to its investigation of the claim, as long as there is coverage otherwise under the policy, in accord with *Brakeman*, the insured should prevail. Indeed, superficially, the rationale of *Brakeman* should apply with even greater force to a claims-made policy

---

**7.** The court did not specifically state that it was considering an occurrence policy, but it appears from the facts and policy language considered that it was an occurrence policy.

since a claims-made insurer has agreed to indemnify the insured for liability potentially arising years after the occurrence giving rise to the claim. Such an insurer should understand that a claim may be brought to its attention, despite the best efforts of the insured, years after the occurrence giving rise to the claim.

After careful consideration of the differing purposes underlying the issuance of occurrence policies and claims-made policies, however, we conclude that the notice provision of a claims-made policy serves a materially different purpose from one in an occurrence policy. The notice provision of a claims-made policy is just as important to coverage as the requirement that the claim be asserted during the policy period. If the insured does not give notice within the contractually required time period, in the instant case "during the policy period," there is simply no coverage under the policy.

The reasoning of the court in *Gulf Insurance Co. v. Dolan, Fertig and Curtis,* 433 So.2d 512 (Fla.1983), cited by defendant, is persuasive in this regard. In *Gulf,* the respondent law firm had contracted with the petitioner, Gulf, for a claims-made insurance policy for the period November 20, 1978 to November 20, 1979. For coverage to apply the claim had to be made against the law firm, and notice had to be given to the insurer, during the policy period. On November 19, 1979, the firm received written notice of a malpractice claim a client intended to bring against it. The firm notified Gulf in writing of the claim on February 12, 1980 after first unsuccessfully seeking coverage from the carrier insuring it after Gulf's policy expired. Gulf denied coverage because it had not been notified of the claim within the policy period. The District Court of Appeals, despite the contractual language to the contrary, held that "there should be a reasonable time after the policy period expires for reporting claims that are discovered late in the policy period, even though the time extends beyond the termination of the policy." *Id.* at 514. Reversing that holding, the Florida Supreme Court stated:

With claims-made policies, the very act of giving an extension of reporting time after the expiration of the policy period, as the district court proposes, negates the inherent difference between the two contract types.... Claims-made or discovery policies are essentially *reporting* policies. If the claim is reported to the insurer during the policy period, then the carrier is legally obligated to pay; if the claim is not reported during the policy period, no liability attaches. If a court were to allow an extension of reporting time after the end of the policy period, such is tantamount to an *extension of coverage* to the insured gratis, something for which the insurer has not bargained. This extension of coverage, by the court, so very different from a mere condition of the policy, in effect rewrites the contract between the two parties.

*Id.* at 515–16 (emphasis in original).

The court reached this conclusion not merely by relying upon the language of the policy itself, but by looking at the benefits sought by each party when they contract for a claims-made policy rather than an occurrence one. Because a claims-made insurer's liability does not extend beyond the end of a specific term, the court stated that the "insurer can establish his reserves without having to consider the possibilities of inflation beyond the policy period, upward-spiralling jury awards, or later changes in the definition and application of negligence." *Id.* at 516 (quoting Comment, *The "Claims Made" Dilemma In Professional Liability Insurance,* 22 U.C.L.A.L. Rev. 925, 928 (1975)). In return for this certainty, an insured pays a lesser premium, *id.* at 516; *see also Detroit Automobile Inter-Insurance Exchange v. Leonard Underwriters, Inc.,* 117 Mich.App. 300, 323 N.W.2d 679 (1982), and receives broader coverage than under an occurrence policy because conduct occurring before the policy term is covered. Comment, *supra,* 22 U.C.L.A.L.Rev. at 929.

Under these circumstances, in the absence of Pennsylvania Appellate authority

on point, we can only predict how the Pennsylvania Supreme Court would hold. *See Mazzula v. Monarch Life Insurance Co.,* 487 F.Supp. 1299 (E.D.Pa.1980). We do not believe that the *Brakeman* holding should apply to a claims-made policy. None of the considerations leading to the holding in that case are present here. First, the court in *Brakeman* found that automobile drivers could not bargain over the substance of the notice provision in their policies because the provisions are "uniformly found in liability insurance policies." 472 Pa. at 73, 371 A.2d at 196. Here, on the other hand, the plaintiff city could have bargained for an occurrence policy in which notice would not have been of the essence of the contract, or it could have obtained a policy with an extended discovery period providing coverage for claims made during the policy period and reported to the company during the extended discovery period.[8] *See Gulf Insurance Co., supra,* and cases cited therein.

Second, the court in *Brakeman* was concerned that accepting the insurer's argument there concerning the late notice would work a forfeiture because the insured would be denied the coverage he had paid for in premiums. 472 Pa. at 73, 371 A.2d at 196–97. In the instant case, accepting the insurer's argument would not involve a forfeiture since the insured has paid a lower premium for coverage that is

retrospective only. To find for the defendant insurer here would give the plaintiffs exactly what they had bargained for and not less.

Finally, the court in *Brakeman* concluded that if an insurer could not show prejudice from a late notice, the purpose of the notice provision in an occurrence policy, to give the insurer time to investigate the claim for defense or settlement, would not have been frustrated. *Id.* at 74–75, 371 A.2d at 197. In a claims-made policy, the provision requiring notice before the end of the policy period serves a different purpose. It provides a certain date after which an insurer knows that it no longer is liable under the policy, and accordingly, allows the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty. *See Gulf Insurance Co., supra.* We conclude therefore that *Brakeman* is inapplicable to this case.

We will issue an order consistent with this memorandum.

---

**8.** In a brief in opposition to Woolf/Strite's motion to dismiss plaintiffs argue that there is inequality of bargaining power here because the insurer was only providing surplus line coverage and plaintiffs contend, citing the Unlicensed Insurers Act, Act of Jan. 24, 1966, P.L. (1965) 1509, § 1, *et seq.,* 40 P.S. § 1006.1 *et seq.* (Purdon & Purdon Supp.1984–85), that the insured is "at the mercy of the carrier that accepts" this kind of risk. As we read the Act, however, its purpose is not, as plaintiff implies, to find insurance for entities that cannot find an insurer in Pennsylvania willing to accept the risk of insuring it. Rather, the Act protects insurance companies, licensed in Pennsylvania, from the unfair competition of unlicensed insurers and also Pennsylvania consumers of insurance. Thus, the Act requires, *inter alia,* that before a broker contracts with an unlicensed insurer: (1) the risk must have been offered to at least three licensed insurers which accept in the usual course of business risks of the same class; (2)

the premium rate for the surplus line insurance is not lower than the lowest rate authorized by the insurance commissioner, and (3) the policy issued does not differ materially from a licensed insurer's policy. *See* 40 P.S. § 1006.4.

We also note that the absence of an extended discovery clause in the instant case does not appear to be a crucial issue. The policy period ended on January 15, 1983. The suit against Mayor Reed was filed on November 4, 1982. While there is nothing in the record to indicate when Mayor Reed was served, we do know that he must have had notice of the suit by November 5, 1982, when the newspaper stories appeared. Thus, Mayor Reed had approximately two and one-half months to notify the company. Hence, the holding of *Gulf Insurance Co.,* would seem to apply here *a fortiori* since the insured in that case was notified of the claim one day before the end of the policy period but the court still denied recovery there.