**WESTPORT INSURANCE CORPORATION,**
Plaintiff,

v.

Daniel G. LILLEY, et al., Defendants.

**No. CIV.03–36–P–K.**

United States District Court,
D. Maine.

Nov. 13, 2003.

Louis B. Butterfield, Portland, ME, Carol L. Johnson, Bollinger, Ruberry, & Garvey, Citicorp, Chicago, IL, for Plaintiff.

Jack H. Simmons, Berman & Simmons, P.A., Jeffrey Rosenblatt, Berman & Simmons, P.A., Lewiston, ME, Paul R. Dumas, Jr., Law Office of Paul R. Dumas, Jr., LLC, Mexico, ME, for Defendants.

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

2. Westport's motion broadly requests a declaration that it has no duty to defend *or* indemnify the Lilley defendants. It logically following that if there is no duty to defend, there can be no duty to indemnify. As the Lilley defendants point out, the duty to indemnify cannot be established until one knows on

## MEMORANDUM OF DECISION[1] ON CROSS–MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO STRIKE

KRAVCHUK, United States Magistrate Judge.

Westport Insurance Corporation filed suit seeking a declaratory judgment that it has no duty to defend or indemnify[2] the law firm of Daniel G. Lilley, P.A., or its associates, in connection with a professional negligence claim held by Patricia Walker, whom Westport also named as a defendant. The Lilley defendants have counterclaimed, seeking a declaration that Westport owes a duty to defend them against loss. The parties have filed cross-motions for summary judgment on which I now rule. The Lilley defendants' cross-motion for summary judgment, in which Walker joins, is **GRANTED**. I find that Westport owes a duty to defend the Lilley defendants against Walker's claim.

### Summary Judgment Material Facts

The following facts are drawn from the parties' Local Rule 56 statements of material facts, responsive statements of material facts and reply statements of material facts. *See* D. Me. Loc. R. 56. Certain background facts are also drawn from the parties' pleadings and from the Law Court's opinion in *Walker v. MaineGeneral Med. Ctr.*, 2002 ME 46, 792 A.2d 1074. The parties have presented to the Court

what theory Walker's malpractice action proceeds. That complaint has not yet been filed and it would be premature to issue declaratory relief as to the duty to indemnify, a narrower question than the duty to defend. *Home Ins. Co. v. St. Paul Fire & Marine Ins.*, 229 F.3d 56, 66 (1st Cir.2000). Suffice it to say, based upon the record presently before me, it appears that in this case those duties maybe coterminous, but a declaration of the duty to indemnify is not the subject of the Lilley motion.

all of the evidence that they deem material to the case. There is no request for a bench trial and the parties have not demonstrated that any factual issues are disputed, only that they consider certain of their opponent's evidence to be immaterial or irrelevant to the Court's disposition.

For the past several years, plaintiff Westport Insurance Corporation or its predecessor in interest has been providing professional liability insurance to the law firm defendant, Daniel G. Lilley, P.A., through a series of annual policies. These policies have provided "lawyers professional liability coverage" against claims alleging professional negligence or attorney malpractice on the part of attorneys associated with the firm (Customized Practice Coverage, Lawyers Professional Liability Coverage Unit, Docket No. 21, Exs. 8 & 10.) These policies are designated by Westport as "claims made and reported" policies. Thus, except as otherwise provided, "coverage is limited to liability for only those claims which are first made against the named insured and reported to the Company while the policy is in force." (*Id.*, Notice Section, Docket No. 21, Ex. 8 & 10.) This and the other material language of the policies has remained unchanged over the three annual policy periods running from March 20, 2000 until March 20, 2003. That language extends the following coverage:

> The Company shall pay on behalf of an insured all loss in excess of the deductible which any insured becomes legally obligated to pay as a result of claims first made against any insured during the policy period and reported to the Company in writing during the policy period or within sixty (60) days thereafter, by reason of any wrongful act occurring on or after the retroactive date, if any.

(*Id.*, Lawyers Professional Liability Coverage Unit, § I.A.) However, it excludes coverage for:

> any act, error, omission [or] circumstances ... occurring prior to the effective date of this policy if any insured at the effective date knew or could have reasonably foreseen that such act, error, omission [or] circumstance ... might be the basis of a claim.

(*Id.*, General Terms & Conditions, § XIV.B.) In addition, the policies impose on the insured, as a condition precedent to coverage, certain reporting and notice obligations. Specifically:

> [I]f a claim is made against any insured or if any insured becomes aware of any claim, the insured(s) shall, as soon as practicable, but no later than sixty (60) days after termination of the policy period, provide written notice to the Company.

> If during the policy period, any insured first becomes aware of a potential claim and gives written notice of such potential claim to the Company during the policy period, any claims subsequently made against any insured arising from the potential claim shall be considered to have been made during the policy period.

(*Id.*, Lawyers Professional Liability Coverage Unit, § III.) Finally, the policies define a potential claim as follows:

1. any act, error, omission [or] circumstance ... which might reasonably be expected to give rise to a claim against any insured under the policy; or

2. any breach of duty to a client or third party which has not resulted in a claim against an insured.

(*Id.*, § VII.E.)

Against this contractual backdrop, the following events transpired. In the mid–1990s, Attorney Lilley and other attorneys

in the insured law firm, Daniel G. Lilley, P.A. (hereinafter collectively referred to as "the Lilley defendants"), undertook to represent Patricia Walker in a medical malpractice claim against Dr. Eric Omsberg and MaineGeneral Medical Center based on the death of Walker's husband from one or more post-operative infections. Pursuant to the Maine Health Security Act, 24 M.R.S.A. §§ 2501–2511, the matter first proceeded through a medical malpractice pre-litigation screening panel, the members of which concluded unanimously that neither Dr. Omsberg nor MaineGeneral had deviated from the standard of care in treating the decedent.[3] Despite this inauspicious beginning, Walker pursued litigation and the matter came to trial in Maine Superior Court in September 2000. At the conclusion of the trial, it appeared that Walker had obtained a verdict against MaineGeneral in the amount of $1,476,523.40 for wrongful death of the decedent, plus $150,000.00 for Walker's emotional distress. However, the jury indicated on the verdict form that the decedent was comparatively negligent and reduced the wrongful death award to $32,000.00. Although Walker's counsel failed to request that the jury be polled, evidently believing that the jury had merely reduced the award *by* $32,000.00, the verdict was later questioned by either the Superior Court or MaineGeneral. In post-trial motions, Walker subsequently contended that the jury's intention must have been to reduce the wrongful death award by $32,000.00, not to $32,000.00.[4] In support of her position, Walker argued that the court had instructed the jury to indicate on the verdict form the amount by

which damages should be reduced, not the amount to which it should be reduced. However, the final verdict form, which the Lilley defendants drafted, indicated that the jury should report back the final amount of damages, after making a reduction for any comparative negligence. The Superior Court entered judgment on the verdict and, consistent with it, awarded a judgment in the amount of $182,000.00 in favor of Walker against MaineGeneral. *Walker*, 2002 ME 46, ¶ 7, 792 A.2d at 1076. Thereafter, following another wave of motions, the Superior Court granted Walker a new trial on all issues and with all parties, though Walker had requested a new trial only on the issue of damages. *Id.* The Superior Court reasoned that a new trial was warranted because "of the totality of the circumstances, including the wording of the verdict form, the difficulty the jury demonstrated in using the form, the court's instruction concerning the use of the form [which had been contradictory], and the vast disparity between the damages as found . . . and the amount which purports to have been awarded, plus this court's own misapprehension of the jury's action . . . ." (Order on Post-J. Mots., attached to Aff. of Julian L. Sweet, Docket No. 26, at Bates No. 38.)

The second trial transpired in May 2001, during the 2001–2002 policy period. Walker was not successful. The second jury found no negligence on the part of either defendant. *Walker*, 2002 ME 46, ¶ 7, 792 A.2d at 1077. There is no suggestion of any error in the second trial.

On appeal to the Law Court, Walker argued that the Superior Court had erred

---

3. There is no suggestion in the record that the lack of success before the panel had any relationship to the quality of the representation afforded by Daniel G. Lilley, P.A.

4. Maine law requires a jury to reduce a damage award "to such extent as the jury thinks just and equitable having regard to the claimant's share in the responsibility for the damage," but a claimant who is "equally at fault . . . may not recover." 14 M.R.S.A. § 156. Thus, a 98 percent reduction in the wrongful death award, while not legally impossible, was certainly curious.

during the first trial with respect to its comparative negligence instruction and should have ruled that the decedent could not have been comparatively negligent with respect to the claim against Maine-General as a matter of law. *Id.*, ¶ 8 at 1078. Observing that Walker had not articulated this argument during the trial and had thus waived appellate review, the Law Court reviewed only for obvious error. *Id.*, ¶¶ 13–14 at 1078. Nevertheless, the Law Court concluded that "sufficient evidence [existed] from which the jury could have found that [the decedent] was negligent *during* his course of treatment by the hospital." *Id.*, ¶ 15 at 1078 (italics in original). The Law Court affirmed the Superior Court on this and all other appellate issues and held that the judgment entered on the second jury verdict would stand. *Id.*, ¶ 1 at 1075. The opinion issued March 27, 2002, during the 2002–2003 policy period.

On May 16, 2002, during the 2002–2003 policy period, Daniel Lilley put Westport on notice that he had received a telephone call that day from Walker's malpractice counsel, who indicated that Walker intended to file a claim against Lilley for professional negligence in connection with his representation on the wrongful death suit against Dr. Omsberg and MaineGeneral. Subsequently, on June 10, 2002, Lilley forwarded to Westport a letter received from Walker's new counsel, providing a written statement of Walker's claim.[5] Walker has yet to commence court proceedings.

On December 17, 2002, Westport reserved its right to exclude coverage for the Walker claim, specifically relying on Customized Practice Coverage, General Terms & Conditions, § XIV.B, set forth above and hereinafter referred to as "Exclusion B." Westport's reservation of rights was worded in the following manner:

> The effective date of your policy with Westport is March 20, 2002. When the first trial was concluded in September 2000 you knew that an error in the jury verdict had occurred. In addition, as of May 2001, you knew that the second trial had resulted in a defendants' verdict. Therefore you knew prior to the effective date of your policy, which was March 20, 2002 that a [wrongful act] had occurred in this matter and knew or could have reasonably foreseen that such [wrongful act] could result in a claim against you.

(Addendum to Lilley defendants' Statement of Material Facts, Docket No. 21, Ex. 18.) According to Westport, had the Lilley defendants notified it as soon as the Walker claim was foreseeable, the claim that was subsequently made would have been covered under the policy in effect at that time. (Pl.'s Opp. to Lilley's Mot. Summ. J., Docket No. 29, at 4 ("If the Insureds had reported a potential claim when it became reasonably foreseeable ... they would have had coverage for that claim under the policy in force at the time even if the claim was not actually made until after the term of the policy had expired.").)

---

5. The letter from Walker's current counsel reads, in pertinent part, as follows:

   Please be advised that I represent Patricia Walker[] in connection with your firm's representation of her in the case of Patricia Walker vs. Maine General Medical Center. Patricia Walker has commissioned me to inform you that she intends to bring a legal malpractice action against you and your firm for what happened in the case that you

   tried against Maine General ... on her behalf. I respectfully refer you to the Maine Supreme Court [o]pinion .... Ms. Walker maintains and the Law Court seems to confirm that several errors were made during your representation of her in the above captioned [case].

   (Addendum to St. Mat. Facts, Docket No. 21, Ex. 17.)

Westport fails to refute that the timing of the Lilley defendants' notice did not affect its ability to investigate, raise any applicable defenses to or defend the Lilley defendants against Walker's claim. After receiving notice of the Walker claim, Westport renewed the policy for the March 20, 2003 through March 20, 2004 period without modifying any terms contained therein. Westport's corporate designee testified that she did not know whether the premium on the policy would have increased in 2001–2002 period had the potential Walker claim been reported during the 2000–2001 policy period because the reporting of a potential claim does not necessarily have an impact on premium rates.

Daniel Lilley has testified that he did not consider his handling of the Walker case to be a concern until after the Law Court issued its opinion on appeal.[6] Also relevant is the fact that Walker retained the Lilley defendants after the alleged errors, throughout her second trial and throughout the appellate process.[7] Westport has not offered any expert testimony and is not prepared to do so.

### Discussion

In its one-count declaratory judgment action Westport seeks to obtain a judgment that, pursuant to Exclusion B, it does not owe a duty to defend or indemnify the Lilley defendants in connection with the Walker claim under the policy in effect for

the policy period March 20, 2002, to March 20, 2003. (Compl. for Declaratory J., Docket No. 1.) The Lilley defendants' counterclaim seeks a contrary declaration. In the alternative, the Lilley defendants request a declaration that Westport owes a duty to defend under the policy in effect for the prior policy period, March 20, 2001, to March 20, 2002. (Am. Answer and Countercl., Docket No. 13.) The parties are in agreement that Maine law governs their dispute over the construction and application of the relevant policy language.

1. *The coverage language in the 2001–2002 policy does not extend coverage to Walker's claim.*

Pursuant to the coverage language, Westport will provide coverage on "claims first made against any insured during the policy period and reported to the Company in writing during the policy period or within sixty (60) days thereafter, by reason of any wrongful act occurring on or after the retroactive date, if any." (Customized Practice Coverage, Lawyers Professional Liability Coverage Unit, § I.A.) Walker's claim was first made in May 2002, after the policy period had expired. Although the claim was made within 60 days of the end of the policy period, the 60–day extension applies only to the reporting requirement.[8] Because Walker's claim was not made during the 2001–2002 policy period, that policy does not provide coverage for the claim.

6. The Lilley defendants have also designated an experienced trial attorney as an expert witness who would offer the opinion that "until the receipt of the opinion issued by [the Law Court], . . . Mr. Lilley would have had no reason to be aware of the fact that anyone was critical of his handling of the case." (St. Mat. Facts in Support of Lilley Defs. Mot. Summ. J., Docket No. 21, ¶ 27.) Westport moves to strike Lilley's expert testimony from the summary judgment record on the ground that it is offered on a question of law and is immaterial. (Pl.'s Mot. to Strike Portion of

Defs.' Statement of Material Facts and Dep. Test. of Charles H. Abbott, Docket No. 31.) Because my ruling does not turn in any way on this expert testimony, I **GRANT** the motion to strike.

7. The law firm currently representing the Lilley defendants assisted Walker and the Lilley defendants with Walker's appeal.

8. It also appears that the Lilley defendants first gave *written* notice of the Walker claim in June 2002, beyond the 60–day timeframe.

*2. The coverage language in the 2002–2003 policy does extend coverage to the Walker claim, and Exclusion B does not negate coverage.*

■ Because the Walker claim was made in May 2002 and reported in writing in June 2002, it was both made and reported during the 2002–2003 policy period. Therefore, unless Exclusion B applies, coverage exists under the 2002–2003 policy. In order to evaluate whether Exclusion B applies, it is necessary to address if, and if so when, the Lilley defendants could have reasonably foreseen that Walker might pursue a claim against them. Pursuant to Exclusion B:

> This policy shall not apply to any claim based upon, arising out of, attributable to, or directly or indirectly resulting from ... any act, error, omission [or] circumstance ... occurring prior to the effective date of this policy if any insured at the effective date knew or could have reasonably foreseen that such act, error, omission [or] circumstance ... might be the basis of a claim.

The language of Exclusion B has been treated by numerous other courts. It has generally been viewed as unambiguous, *see Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, LLP,* 267 F.Supp.2d 601, 607 (E.D.Tex.2003); *Ehrgood v. Core-*

*gis Ins. Co.,* 59 F.Supp.2d 438, 443 (M.D.Pa.1998); *Coregis Ins. Co. v. Wheeler,* 24 F.Supp.2d 475, 478 (E.D.Pa.1998); *Coregis Ins. Co. v. McCollum,* 961 F.Supp. 1572, 1579 (M.D.Fla.1997); *Coregis Ins. Co. v. Camico Mut. Ins. Co.,* 959 F.Supp. 1213, 1221 (C.D.Cal.1997); *Mirarchi v. Westport Ins. Corp.,* 2003 WL 1918975, *3, 2003 U.S. Dist. LEXIS 6753, *11 (E.D.Pa. Apr. 23, 2003), and I concur in that evaluation. By its terms, whether the exclusion applies turns directly on the facts known to the Lilley defendants prior to the effective date of the policy. Based on those facts, the Court must decide whether a reasonable attorney in possession of such knowledge would reasonably foresee that a malpractice claim might be forthcoming. This test incorporates both subjective and objective elements. Whether the Lilley defendants could have reasonably foreseen Walker's malpractice claim is an objective test that can be determined as a matter of law, but it must be determined based only on those facts and circumstances that the Lilley defendants were subjectively aware of. *Atchley, Russell,* 267 F.Supp.2d 601, 607–608 & nn. 4 & 5; *Ehrgood v. Coregis Ins. Co.,* 59 F.Supp.2d at 443; *Mirarchi,* 2003 WL 1918975, at *3–4, 2003 U.S. Dist. LEXIS 6753, at *11–13.[9]

Westport bears the burden of proof when it comes to demonstrating the appli-

---

9. The Third Circuit Court of Appeals has held that the test essentially requires a court to determine whether "a reasonable lawyer in possession of such facts would have had a basis to believe that the insured had breached a professional duty." *Selko v. Home Ins. Co.,* 139 F.3d 146, 152 (3d Cir.1998). *See also Coregis Ins. Co. v. Baratta & Fenerty, Ltd.,* 264 F.3d 302, 307 n. 3 (3d Cir.2001) ("A breach of a professional duty and a basis for a claim are thus 'two peas in a pod.' If the former occurs, experience teaches that the latter can be expected to follow."). This phraseology arose out of that court's effort to discredit the notion that an individual insured might escape the consequences of Exclusion B if he legitimately professed subjective "ignorance of the

law, oversight, psychological difficulties, or other personal reasons" for failing to recognize and report the existence of a potential claim. *Selko,* 139 F.3d at 152. This construction tends to force the issue of whether malpractice actually occurred, which does not seem advisable for obvious reasons. My assessment is that this construction simply arose from what were very clear cases of malpractice, without consideration of more difficult fact patterns such as the one presented by the instant case. *See Selko,* 139 F.3d at 147–48 (describing how attorney misappropriated client funds to invest in attorney's private real estate ventures); *Baratta & Fenerty, Ltd.,* 264 F.3d at 304 (describing how client's case was dismissed ten years after

cability of its coverage exclusion. *Mut. Fire Ins. Co. v. Hancock,* 634 A.2d 1312, 1313 (Me.1993); *see also Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co.,* 220 F.3d 1, 4 (1st Cir.2000) (applying Massachusetts law). According to Westport, "Based on the facts known to the insured, the conclusion is inescapable that Walker's claim was reasonably foreseeable" prior to the 2002–2003 policy's inception date. (Pl.'s Mot. Summ. J. and Supporting Mem. of Law, Docket No. 17 at 3.) I find this argument unpersuasive. I disagree that such a conclusion is "inescapable," given the nature of the claimed "act, error, or omission [or] circumstances" that might be the basis of Walker's claim.

■ The Lilley defendants knew, and it is objectively apparent, that they were representing Walker in a very difficult case that was fraught with serious legal issues. In spite of the difficulties, they managed to obtain what at first appeared to the judge and counsel to be a sizable verdict in her favor. When the court entered judgment in Walker's favor for an amount considerably reduced from the size of the apparent verdict, Westport argues the Lilley defendants should have reasonably foreseen that those circumstances would someday be the basis of a claim against them. Westport's entire argument turns on the circumstances that allowed a verdict to "slip away." Westport conveniently ignores the substantial issues in the medical malpractice case relating to comparative negligence, statutory damage caps, and causation of death and/or injury. To say that the Lilley defendants could have reason-

ably foreseen a claim against them in September 2000, means that any trial attorney who loses a substantial jury verdict, whether representing plaintiff or defendant, should put his carrier on notice that the client may ultimately seek compensation from the lawyer. Westport's reasoning runs as follows: "[A] claim by Walker was reasonably foreseeable. She had a million dollar verdict 'taken away' from her. Where else would she go to seek compensation for the death of her husband, other than a legal malpractice claim against her former lawyers?" (*Id.* at 4.)

It is conceivable that had the Lilley defendants asked the Superior Court to poll the jury, the jurors might have revealed that the final amount indicated on the form was a scrivener's error and that they intended to make a million-dollar award. Despite this hypothetical, I do not agree that a reasonable attorney would have reasonably foreseen, as of the Superior Court's ordering of a new trial, that the attorney-client relationship would likely end in a malpractice claim. Although any "act or omission" by an attorney that did not result in a hugely favorable outcome to the client "might" lead a client to make a claim and "foreseeability" is a virtually limitless concept, the touchstone here is reasonableness, not conceivability.[10] *See, e.g., Atchley, Russell,* 267 F.Supp.2d at 608 n. 5 ("This exclusion prevents attorneys from engaging in willful blindness, i.e., it excludes claims where the attorney had constructive knowledge that a claim *would* be filed against him. The Court then must determine whether the circumstances surrounding the current lawsuit gave the insured constructive knowledge of an *im-*

---

filing based on lack of activity and how client sent attorney a letter expressing severe dissatisfaction).

10. Westport argues that Walker would have had a claim against the Lilley defendants even if the second trial had been a resounding

success or if the Law Court had remanded for entry of judgment in Walker's behalf, because of the time and expense of the second trial. (Docket No. 17 at 5.) Such a claim might be conceivable, but I do not believe it would be reasonably foreseeable that a successful client would make such a claim.

*pending* claim prior to the policy period.") (emphasis added).[11] In this case I do not find that the claim made on May 16, 2002 based on the allegation that the "Law Court seems to confirm that several errors were made during your representation," was foreseeable to the Lilley defendants prior to the 2002–2003 policy period.

3. *The Lilley defendants' primary argument in support of their own summary judgment motion of whether Maine law requires Westport to show prejudice in order to enforce Exclusion B need not be decided at this time.*

The Lilley defendants argue that Exclusion B is not enforceable in Maine absent a showing of prejudice. If true, they would be entitled to a favorable summary judgment ruling because they have made a showing that Westport cannot demonstrate prejudice and Westport has failed to generate a genuine issue of material fact

on that question. The primary basis for the prejudice argument is Title 24–A M.R.S.A. § 2411. Pursuant to that statutory provision, misrepresentations, omissions, concealment of facts and incorrect statements made in any application for insurance may not prevent a recovery under an insurance policy or contract of insurance unless fraudulent and/or material to the insurer's decision to insure the risk. *Id.; see also Am. Home Assurance Co. v. Ingeneri*, 479 A.2d 897, 900 (Me.1984). The only conceptual concern with this argument is that Exclusion B creates a prior knowledge exclusion that, arguably, does not turn on notice. The language of Exclusion B excludes coverage when it is shown that an insured knew or could have reasonably foreseen, prior to the effective date, that the underlying act, error, omission or circumstance might be the basis of a claim. However, the policy's time limitation on reporting potential claims coincides with the policy period. (Customized Prac-

11. Westport argues that Walker's claim was foreseeable prior to the second trial because "lightning would have to strike twice" for Walker to win at the second trial. (Docket No. 17 at 4.) Assuming that lightning did strike in the first trial, it is worth noting that reasonable attorneys who make lightning strike do not reasonably anticipate that their clients will make a claim against them based on what appears to be juror confusion, particularly where the client's claim remains viable in all respects and there is a basis to believe that lightning could strike again. In other words, when evaluating whether the circumstances made it reasonably foreseeable that Walker might file a malpractice claim, I believe that the continued viability of her tort suit makes all the difference. Not only did the appearance of success during the first trial suggest the possibility of a substantial verdict being returned for Walker following a second trial, but it also could reasonably be expected to have a significant impact on subsequent settlement negotiations. In fact, court records reflect an offer of judgment from MaineGeneral of $325,000 prior to the second trial. (Def. Mid Maine Med. Ctr.'s

Offer of J., dated Apr. 20, 2001, attached to Tr. of Dep. of Daniel G. Lilley, Docket No. 19.) And it is certainly relevant to the totality of the circumstances known to the Lilley defendants that Walker continued to retain them and preferred a second trial to a $325,000 settlement offer. Finally, there is no evidence in the record that Walker ever demonstrated dissatisfaction with the Lilley defendants' representation prior to the effective date of the 2001–2002 policy or, for that matter, the 2002–2003 policy.

In sum, given the inconclusive and confusing nature of the first jury verdict, the continued viability of Walker's claim following the Superior Court's decision to conduct a new trial on all issues, the sizeable settlement offer from MaineGeneral, Walker's continued retention of the Lilley defendants and the total absence of any evidence in the record that Walker was critical of the Lilley defendants' handling of her and her children's claims, a reasonable attorney would not reasonably foresee that Walker would make a claim prior to the ultimate unfavorable entry of judgment against all of Walker's claims after the appeal.

tice Coverage, Lawyers Professional Liability Coverage Unit, § III (requiring written notice of potential claims "during the policy period").) Additionally, each year's renewal application materials request the very information on which Exclusion B turns. Moreover, Westport has conceded that coverage would exist under the circumstances of this case but for the fact that *notice* was not timely provided. Finally, it has been suggested that the prior knowledge exclusion is purposefully designed to avoid having to litigate the prejudice issue in the context of contract rescission actions by the insurer, which are generally founded on alleged misrepresentations in application materials. *Atchley, Russell,* 267 F.Supp.2d at 608 n. 5. In other words, there is a clear link among the prior knowledge exclusion, the notice concept and Westport's annual application process, which raises the concern that enforcement of Exclusion B would be contrary to the "legislative purpose of protecting the insured," *Ingeneri,* 479 A.2d at 901, which is embodied in 24–A M.R.S.A. § 2411. Moreover, in *Ingeneri,* the Law Court held in the context of a comparable legal malpractice coverage dispute that "in order to avoid coverage for lack of *notice* [regarding a potential claim,] the insurer

must demonstrate prejudice." *Id.* at 898 (emphasis added).

Westport argues that courts have rejected the prejudice requirement in the context of "claims made" policies.[12] In support of this proposition, Westport cites *Ameriwood Indus. Int'l Corp. v. American Cas. Co.,* 840 F.Supp. 1143, 1148–49 (W.D.Mich.1993). In fact, the issue is not mentioned in *Ameriwood.* The only statement found therein is the assertion that "claims made policies generally include a number of endorsements and exclusions intended to limit ... front end risk by cutting off liability for claims ready, but not yet made, at the start of the policy period." *Id.* at 1149.

I have independently found a handful of cases in the District of Pennsylvania that discuss whether a Pennsylvania state common law notice-prejudice rule should be extended to claims made policies, one of which also involves Westport's same prior knowledge exclusion. The notice-prejudice rule was first laid down by the Supreme Court of Pennsylvania in *Brakeman v. Potomac Insurance Company* in the context of an automobile insurance, occurrence-type policy. 472 Pa. 66, 371 A.2d 193 (1977).[13] The federal district courts in the

---

**12.** Claims made policies and occurrence policies have been described as follows:

> A "claims made" policy provides coverage for claims made against the insured provided that the negligent or omitted act that forms the basis for a claim is discovered and brought to the attention of the insurer within the policy term. A "claims made" policy differs from an "occurrence" policy, the other major type of insurance policy, because an "occurrence" policy insures against the occurrence itself during the policy period, regardless of when the resulting claim is asserted.

> *Westport Ins. Corp. v. Mirsky,* 2002 U.S. Dist. LEXIS 16967, \*7–8, 2002 WL 31018554, \*3 (E.D.Pa. Sept. 10, 2002) (citing *Pizzini v. Am. Int'l Specialty Lines Ins. Co.,* 210 F.Supp.2d 658 (E.D.Pa.2002)).

**13.** See *Brakeman,* 472 Pa. at 75–76, 371 A.2d at 197–98 (citation omitted):

> We have in the past excused a condition of forfeiture where to give it effect would have been purely arbitrary and without reason, and we are of the opinion that, in the absence of prejudice to the insurance company, such a situation exists in the context of a late notice of accident. Allowing an insurance company, which has collected full premiums for coverage, to refuse compensation to an accident victim or insured on the ground of late notice, where it is not shown timely notice would have put the company in a more favorable position, is unduly severe and inequitable.

District of Pennsylvania have declined to extend this common law rule to claims made policies, "in recognition of the critical differences between [claims made and occurrence] type[ ] policies," *Pizzini v. Am. Int'l Specialty Lines Ins. Co.*, 210 F.Supp.2d 658, 669 (E.D.Pa.2002), which difference has been described as follows:

> The purpose of the notice provision in an occurrence policy [is] to give the insurer time to investigate the claim for defense or settlement ... In a claims made policy, the provision requiring notice before the end of the policy period serves a different purpose. It provides a certain date after which an insurer knows that it no longer is liable under the policy, and accordingly, allows the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty.

*City of Harrisburg v. Int'l Surplus Lines Ins. Co.*, 596 F.Supp. 954, 962 (M.D.Pa. 1984), *aff'd,* 770 F.2d 1067 (3d Cir.1985) (unpublished appellate opinion); *see also Pizzini*, 210 F.Supp.2d at 669 (collecting cases).[14] Although this rationale appears to have some momentum, it is important to observe that the courts adopting it are almost exclusively[15] addressing cases in which claims made coverage was being excluded because notice has not been provided of *actual claims* made during the policy period until *after* the policy period.

In other words, these cases do not narrowly address the distinct question of whether this rationale is sound in the context of the prior knowledge exclusion, which, if applied, would (in this case) serve to bar coverage for failure to provide notice of a *potential* claim *prior* to the inception of a *renewal* policy, even though the actual claim is made and reported during the policy period and the policy provides coverage on a claims made and reported basis. Moreover, these cases do not involve jurisdictions with statutes such as 24–A M.R.S.A. § 2411 and appear not to involve jurisdictions with state law precedents such as *Ingeneri*. This aspect of the case presents a novel issue of Maine law that is very difficult to predict. I believe, therefore, it makes good sense to avoid addressing the issue when the case can be decided on the plain meaning of Exclusion B's application to the undisputed facts in this record. I therefore do not reach the primary issue raised in the Lilley defendants' motion for summary judgment.

## Conclusion

Based upon the foregoing, Westport's motion for summary judgment (Docket No. 17) is **DENIED**. The Lilley defendants' motion for summary judgment (Docket No. 20) is **GRANTED**. For the reasons stated herein, I find that a duty to defend exists for the Walker claim under

**14.** Among the cases collected in *Pizzini* are two federal court cases that address state statutory law, which is roughly parallel to 24–A M.R.S.A. § 2411, and conclude that prejudice must be demonstrated even in the context of claims made policies. *See Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087 (7th Cir.1999) (applying Wisconsin law); *Sherlock v. Perry*, 605 F.Supp. 1001 (E.D.Mi. 1985) (applying Michigan law).

**15.** I have not attempted to canvass all of the available precedents, but it appears that at least one court has rejected application of a common law prejudice rule in the context of

Westport's prior knowledge exclusion, albeit in an unpublished opinion that fails to discuss the concern identified herein. *Westport Ins. Corp. v. Mirsky*, 2002 U.S. Dist. LEXIS 16967, *31, 2002 WL 31018554, *11, ¶ 6 (E.D.Pa. Sept. 10, 2002) (finding that "[u]nder Pennsylvania law, the 'notice-prejudice' rule does not apply to 'claims made' policies" and citing *Pizzini* and other distinguishable cases). *Mirsky* involved a medical malpractice case that was lost because the attorney failed to comply with discovery orders and as a sanction was barred from presenting expert testimony. All of that occurred prior to the inception of the policy period.

the 2002–2003 policy, and that Exclusion B does not serve to negate coverage.